IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK E. FERRARI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-94 |
| | ) | |
| v. | ) | Judge Gary L. Lancaster |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| JO ANNE B. BARNHART, SECRETARY | ) | |
| of HEALTH and HUMAN SERVICES, | ) | Doc. 11, 15 |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (Docket No. 11) be granted, that Defendant's Motion for Summary Judgment (Docket No. 15) be denied, and the decision of the Commissioner of Social Security ("Commissioner") denying an award of disability insurance benefits and supplemental security income be reversed and the case be remanded for rehearing, pursuant to sentence four of 42 U.S.C. § 405(g), and for such other proceedings as are consistent with this Report and Recommendation.

II.    REPORT

Presently before the Court for disposition are the parties' cross-motions for summary judgment.

A.    Procedural History

On January 20, 2006, Plaintiff, Jack E. Ferrari, by his counsel, timely filed this civil action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§405(g) and 1383(c)(3), for judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. On December 11, 2002, Plaintiff filed an application for DIB and SSI alleging that he became disabled on August 13, 2001 due to C5-C6 fusion with chronic back and neck pain, left hand and arm weakness, numbness in hand, and an inability to sit for more than fifteen to thirty minutes. (R. 18, 51-53, 74.) On May 19, 2003, the Social Security Administration (SSA) denied his claim for disability insurance benefits, finding that he was not disabled under the applicable rules. (R. 32-36.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on the denial of both his DIB and SSI claims, which was ultimately before ALJ Melvin Rosenberg on April 29, 2004. (R. 18, 25, 37.)

On July 28, 2004, the ALJ denied Plaintiff's claim for DIB and SSI, concluding that although Plaintiff's conditions were severe, they did not meet or medically equal any of the listings in Appendix 1, Subpart P, Regulation No. 4,[1] when considered in accordance with the revised musculoskeletal listings published at 66 Fed. Reg. 58010, 2001 WL 1453802 (Nov. 19, 2001).[2] (R.

---

[1]     Specifically, the ALJ found that Plaintiff's degenerative disc disease did not result in "significant nerve compression" and therefore did not meet or equal any of the requirements under Listing 1.04A *Disorders of the spine*. Likewise, the ALJ found that Plaintiff's generalized anxiety disorder ("GAD") resulted in no more than moderate limitations in any of the Part B criteria of Listing 12.06, and further, that medications such as Klonopin were beneficial in controlling his GAD. The ALJ concluded that Plaintiff's GAD did not meet or equal Listing 12.06, *Anxiety Disorders*. Plaintiff does not challenge the ALJ's conclusion regarding his GAD.

[2]     The final rules published at 66 Fed. Reg. 58010, which revised the musculoskeletal listings, stress a finding of disability on the basis of how the individual is functioning. *See* 66 Fed. Reg. 58010, 2001 WL 1453802 (Nov. 19, 2001). The sections on "ability to ambulate" and "perform fine and gross movements" effectively represent the appropriate benchmarks for deciding whether the majority of musculoskeletal impairments are of listing-level severity. The regulations further explain that "regardless of the cause(s) of a musculoskeletal impairment, the functional loss that must result from certain listed impairments is defined in terms of 'the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment'." *See* final sections 1.00B2b and 1.00B2c. Both sections use the term "extreme" to describe functional loss. In final sections 1.00B2b and 1.00B2c, an "extreme" loss is defined in terms of the individual's ability to independently initiate, sustain, or complete activities. Additionally, under final section 1.00B2c, "inability to perform fine and gross movements effectively," loss of function of one arm (including amputation of the arm), but continued excellent use of the other arm, would not satisfy the definition. It is repeatedly stressed the criteria expressed in the listings are intended to define limitations that prevent any gainful activity.

18-1,; 23, Finding Nos. 3, 4.) Upon review of the record, the ALJ noted that the Plaintiff had degenerative disc disease of the cervical spine, with status post disc herniation and cervical fusion surgery, radiculopathy, and a generalized anxiety disorder. (R. 19.)  The ALJ then determined that Plaintiff could not return to his past relevant work, but retained the residual functional capacity to perform a significant range of work at the sedentary level of exertion. (R. 21; 23, Finding Nos. 7, 12.)  Based on testimony from a vocational expert, the ALJ found that such work exists in significant numbers in the national economy, thus denying the Plaintiff's claim. (R. 23, Finding No. 13.)  Plaintiff timely requested a review of the ALJ's decision by the Appeals Council.  (R. 13.)  After having received and considered three additional exhibits, the Appeals Council denied the Plaintiff's request on November 21, 2005, and accordingly, the decision of the ALJ became the final decision of the Commissioner. (R. 7-10.) Plaintiff then filed the present action in this Court requesting reversal of the ALJ's decision.

The issue before this Court is whether the decision of the Commissioner denying Plaintiff's claims for disability insurance benefits and supplemental security income benefits is supported by substantial evidence.  In particular, Plaintiff complains on appeal that the ALJ's decision is not supported by substantial evidence and challenges it on the grounds that the ALJ erred in: (1) determining that his impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, subpart P, Regulation No. 4; (2) finding that his allegations

---

The final rules also describe the changes to the listing with regard to measurement of muscle strength.  It explains that the 5-point scale is useful and suggested in conjunction with reports of atrophy for assessing motor function. (See final sections 1.00E1 and 101.00E1.)  Finally, the effects of medication should be considered along with a number of factors outlined in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), as well as the objective medical evidence and all other available evidence, in measuring the total impact of symptoms on the ability to function.

regarding his limitations were not totally credible; (3) relying on a hypothetical posed to a vocational expert which failed to include the results of all of his limitations, and/or provided no justification for not including them; and (4) failing to consider all of his impairments in determining whether he retained the residual functional capacity to perform a wide range of sedentary work, and/or provided no justification for not including them. Defendant argues, however, that the Commissioner's decision is supported by substantial evidence.

### B.   Statement of Facts

#### 1.   General Background

At the time of the hearing, Plaintiff was 48 years old. (R. 18, 392.) He has received both a high school and four-year college education. (R. 18.) He has past relevant work experience as a cardiac rehabilitation specialist and an exercise physiologist, and has had substantial earnings for almost thirty (30) years. (Pl.'s Br. at 1; R. 18, 59.) The Plaintiff testified that his work as a cardiopulmonary rehabilitation specialist for Butler Hospital required being on his feet primarily and lifting up to one-hundred (100) pounds by himself; his work as an exercise physiologist for a nursing facility also required being on his feet, lifting up to one-hundred (100) pounds, and demonstrating exercises.[3] (R. 378.)  However, on August 13, 2001, Plaintiff stopped working due to an automobile accident in which he sustained an injury to his neck, and more specifically, an acute cervical strain and whiplash which superimposed on chronic cervical disc disease with recurrent left cervical radiculopathy. (Pl.'s Br. at 1; R. 74, 94, 115-16, 376.) In September of 2003, Plaintiff  returned to light duty work for approximately twelve (12) days  as a claims representative for the Social Security

---

[3]         During the hearing, the vocational expert testified, and the ALJ found, that both of Plaintiff's past jobs were skilled and performed at the heavy level.  Accordingly, the ALJ found the medium level assigned by the Dictionary of Occupations Titles to these jobs was not consistent with how these jobs were performed in the economy.  (R. 403.)

Office in Butler.[4] (R. 376.)  However, the ALJ found this brief employment did not rise to the level of substantial gainful activity. (R. 18.)  Plaintiff has not engaged in any substantial gainful activity since his alleged onset date of disability of August 13, 2001. (R. 18, 51-53, 74.)

Plaintiff claims to suffer from several impairments and alleges disability due to degenerative disc disease of the cervical spine, status post disc herniation and cervical fusion surgery, radiculopathy, and chronic back and neck pain. (Pl.'s Br. at 1.)  Plaintiff also claims to suffer from chronic asthma, recurrent sinusitis, bronchitis, allergies and allergic rhinitis, a sleep disturbance resulting in daytime fatigue, carpel tunnel of the right wrist, and an anxiety disorder with panic attacks. (Pl.'s Brief at 1; R. 289-90.)

Plaintiff claims that his impairments have resulted in loss of motor function, muscular atrophy, range of motion limitations, tenderness to touch, daily muscle spasms, muscular weakness, sensory loss and numbness, poor reflexes and depression. (Pl.'s Br. at 4; R. 385, 388-92, 393.) Plaintiff also claims that he is unable to lift, bend, or carry without pain or weakness, and has limited ability to kneel, stoop, crouch, balance, reach, and push or pull with his left arm. (R. 74, 388-92; Pl.'s Br. at 4.) Additionally, he claims that he is unable to sit for longer than 15-30 minutes without pain. (R. 74.)

During the hearing, Plaintiff admitted that he is able to clean and dress himself, go shopping, do the laundry albeit with problems if he has to reach, bend, or lift, load the dishwasher, do light cleaning at home, and write checks. (R. 382.) Additionally, he explained that although he drives an automobile, he has problems turning his head and sometimes his hand and arm will go numb if he

---

[4]        Plaintiff further testified that he left his clerical position with the SSA because of arm and neck pain, as well as left-hand numbness.  Moreover, he testified that his work at the SSA involved use of a computer, which exacerbated his pain, and explained that his use of his home computer is limited to about 15-20 minutes at a time. (R. 389-90.)

5

has been driving for too long. (R. 390.)  Plaintiff also testified that he has a tendency to drop things and would not be able to lift or carry a full gallon of milk, for example, with his left hand. (R. 390-91.) He further testified that he is predominantly right-handed. (R. 390-91.)

Plaintiff testified that traversing down stairways causes him pain and spasms in his neck and lower back (R. 385), and that the medications he is taking for his various conditions result in additional limitations, including sleepiness and anxiety.[5]  Plaintiff further testified that he does not use any type of medical devices to alleviate his pain other than heat.  (R. 386-87).  Also, he has described his energy level as low and testified that he is unable to sleep at night, sleeping only 3-4 hours; during the day, Plaintiff testified he needs to lie down 1-2 hours a day after mid-afternoon. (R. 395.)

### 2.    Medical History

The medical records show that Plaintiff has received medical treatment from Dr. Eugene Bonaroti, an orthopedic surgeon, Dr. Edward Reidy, a physiatrist, Dr. Neil Busis and Dr. James Uselman,  neurologists, and Dr. John Reefer, his primary care physician. (R. 376-77.)  The evidence further shows that Plaintiff has treated with Dr. John H. Soffietti, a psychiatrist,  for anxiety/panic disorder at least once per year since 1989. (R. 377-78.)

Plaintiff suffers from cervical and lumbar disc problems with associated pain; his cervical disk problems predate the injury he sustained in an automobile accident of 2001.[6] ( R. 286, 244, 74,

---

[5]         In particular, Plaintiff alleges that Flexeril, Ultram and Klonopin cause drowsiness and sleepiness (R. 96, 333, 394); Neurontin causes dizziness (R. 97, 297); Vioxx exacerbates his asthma (R. 97, 111, 296); anti-inflammatory medications cause reflux (R. 344); Beta II inhalers result in nervousness (R. 177); and that he is allergic to sulfa (R. 116-17).

[6]         Prior to 1997, Plaintiff contends he was in good health in terms of his cervical spine and had no prior problems in this regard.  In 1997, Plaintiff had an "insidious onset of neck pain and numbness in the left hand", which was treated conservatively and did not require surgical intervention; he made a complete recovery from this event.  (R. 272.)   In 2000, Plaintiff sustained a work-related injury with a similar injury and outcome.  (*Id.*)

239, 261, 389-91, 283, 116, 111, 109, 140, 142.)  The medical records indicate that the Plaintiff's medical history includes a diagnosis of cervical disc disease, and that after physical therapy and rehabilitation, surgery was deemed unnecessary.  (R. 116.)  An x-ray performed on September 17, 2000 revealed intervertebral disc space narrowing, degenerative changes at C5-C6, and mild bilateral neural foraminal narrowing at C3-C4 and C5-C6.  (R. 230.)   On December 8, 2000, an MRI confirmed Plaintiff's cervical disc disease. ( R. 116, 228.)

On or about August 13, 2001, Plaintiff was in an automobile accident and immediately experienced low back and neck pain.  (R. 251.)  He was taken to the emergency room of Butler Memorial Hospital and released the following day.  (R. 115, 239-44.)  The x-rays performed while Plaintiff was at the emergency room revealed cervical disc disease, which was previously known, and a normal lumbar region. (R. 116.)  Treatment included rest and physical therapy.  (R.  115.)

Subsequently, Plaintiff developed left upper-extremity pain with associated numbness, tingling, and loss of grip strength.  (R. 116, 251.)  Plaintiff also complained of pain that radiated into his left biceps and deltoid area, along with paresthesias in his left thumb and index finger. (R. 116, 251.)  On August 17, 2001, Plaintiff was diagnosed with acute cervical strain and whiplash, which was superimposed on his chronic cervical disc disease with recurrent left cervical radiculopathy.  (R. 115.)  Plaintiff was treated with steroids, non-steroidal anti-inflammatory medication, and physical therapy, but did not experience any long term relief.  (R. 251.)

On September 20, 2001, an MRI of Plaintiff's cervical spine was conducted and revealed the following:

"At the levels of C3-4, and C4-5, there are mildly, diffusely bulging

7

discs   .but do *not* cause any cord compression." "At the level of C6-
7, there is a left, asymmetric posterior spur   .bulging disc as well as
mildly protruding disc.   resulting in neural foraminal encroachment
on the left a C5-6   .there is *mild* cord compression." "At the level
of C6-7, posterior endplate spurs are also present with some
contiguous spur.  There is small more focal right paracentral disc
protrusion.   *These findings .do not cause significant cord
compression*."

(R. 279; emphasis added.)  On October 9, 2001, in a History and Physical report signed by Dr.

Bonaroti, Max Ballard PA-C[7] cited this MRI noting that it revealed a cervical disc herniation at C5-

C6 on the left and opined that this was consistent with the Plaintiff's clinical complaints.  (R. 251.)

Ballard further noted that upon physical examination, the Plaintiff exhibited a full range of motion

in his extremities, but revealed a mildly restricted range of motion in his cervical spine, no overt

motor weakness,  sensation consistent with left C6 changes, and +1/symmetric reflexes in upper

extremities. (R. 252.)  Plaintiff was admitted to Butler Memorial Hospital on October 18, 2001 and

underwent anterior cervical discectomy, along with fusion and plating of C5-C6. (R. 251.)   An

Intraoperative Neurophysiological Monitoring Report, prepared by Gary W. Schuman, Au.D., a

neuromonitorist, indicates the successful decompression of the spinal cord by removal of disc

material, (R. 245), which was also noted in Dr. Bonaroti's operative report stating, "epidural

bleeding was encountered which indicated the root had been well decompressed." (R. 246).

On January 22, 2002, an x-ray of the cervical spine ensured good placement of the bone graft

at C5-C6, as well as mild degenerative discogenic[8] changes at C6-C7. ( R. 276.)  In a letter to Dr.

Bonaroti dated March 14, 2002, Dr. Reidy noted that Plaintiff had a 50% reduction in his neck pain,

---

[7]      PA-C stands for Certified Physician's Assistant.
[8]      Discogenic means "denoting a disorder originating in or from an intervertebral disk." *Stedman's Medical
Dictionary*, 27th ed. (2000) at 508.

no arm pain at that point, some persistent numbness in his hands, and some weakness. (R. 272.) Dr. Reidy also noted that while Plaintiff's post-operative recovery was incomplete, upon physical examination he exhibited well-preserved muscular strength in the major motor groups of the bilateral upper extremities and there was no atrophy. (R. 273.) An MRI of the lumbar spine was performed on April 4, 2002 and revealed early degenerative changes, as well as a slight loss of height and T2 signal. ( R. 275.) Thomas Franco, M.D., confirmed that there was no evidence of spinal stenosis or herniated disc. (R. 275.) The following month, on May 30, 2002, an MRI of Plaintiff's cervical spine showed no change in the disc protrusions since the prior study of September 20, 2001, and no evidence of any complications at the fusion site. (R. 268.)

On May 22, 2002, Dr. James Uselman completed a neurosurgical evaluation of Plaintiff at the referral of Dr. Reefer. (R. 282.) Dr. Uselman's examination revealed normal strength in both upper and lower extremities during manual muscle testing; slight diminished sensation over the left thumb and index finger, and right foot; trace reflexes throughout; no straight leg raising pain or tenderness with rotating either hip; and good range of motion in cervical spine. (R. 282-83.) Dr. Uselman also noted that Plaintiff's MRI scan of the lumbar spine looked essentially normal; however, he noted the scans of the cervical spine showed a C5-6 anterior interbody fusion with a very slight kyphosis at that level. (R. 283.) Dr. Uselman's clinical impression was that while Plaintiff did have some lumbar discomfort, it did not require surgical intervention, and he prescribed some physiotherapy for the lumbar spine. (R. 283.) As for Plaintiff's cervical spine, Dr. Uselman noted that Plaintiff was seven months post-op from an anterior cervical discectomy and interbody fusion and was experiencing recurring symptoms. (R. 283.) Dr. Uselman recommended a follow-up MRI scan followed by a consult with his surgeon, Dr. Bonaroti. (R. 283.)

9

On July 1, 2002, Plaintiff reported to Dr. Reefer that he had been had been doing his physical therapy and exercising religiously and was very impressed with the improvement since the operation; however, Plaintiff still reported some pain in his left flexors and some numbness in his left foot, but no worse than before. (R. 109.)  On July 8, 2002, during a follow-up visit, Dr. Reidy noted that Plaintiff had "continued steady improvement in the last few months," and Plaintiff reported "the neck pain [was] substantially better and the left arm pain [was] gone." (R. 263.)  Dr. Reidy further noted that although there was still some intermittent numbness in the left hand, Plaintiff was having improving strength in the left arm, and the secondary problem of low back pain showed no signs of left lumbar radiculopathy on an EMG as physical therapy had proven fully successful. (R. 263.)  Upon physical examination, Dr. Reidy found that Plaintiff had full strength in the major motor groups of the bilateral lower extremities, however, Plaintiff's left arm reflex was diminished and some atrophy was seen, despite relatively preserved strength in all major motor groups. (R. 263.)  Plaintiff was expected to continue experiencing slow, but steady progress with regard to his status post neck surgery, continue therapy for the low back pain, and take Neurontin as prescribed at bedtime to assist with his sleep. (R. 263.)

In August of 2002, Dr. Bonaroti noted in a letter to Dr. Reefer that despite slow progress and complaints of intermittent neck and upper extremity pain and numbness, Plaintiff was much better than he was pre-operatively.  (R. 286.)  He further noted that a functional capacities evaluation performed in the spring had cleared Plaintiff for medium duty; vocational rehabilitation was ongoing; Plaintiff had a full range of motion of his cervical spine, although he moved quite slowly;

he had good strength in his upper extremities; he had limited range of motion of his lower back due to pain; but overall, he made a reasonable recovery from his anterior cervical discectomy.  (R. 20; 286.)

On September 30, 2002, during a follow up visit, Dr. Reidy documented Plaintiff's complaints of aggravation of the neck pain, as well as left arm pain and associated muscular weakness in the left arm. (R. 262.)  Dr. Reidy noted diminished reflexes and loss of muscle bulk in the Plaintiff's left arm, which he found to be chronic. (R. 262.) Strength tests resulted in 4/5 ratings on the left as compared to Plaintiff's right arm. (R. 262.) Concerned about the muscle weakness, Dr. Reidy ordered another cervical MRI and an x-ray of the cervical spine which revealed improved healing at the fusion site since January 22, 2002, as well as marginal osteophytes found to be "mild in nature." (R. 262, 266.)  Dr. Reidy assessed Plaintiff's cervical post-laminectomy syndrome was possibly worsening. (R. 262.)

Dr. Reidy again examined Plaintiff on March 3, 2003, and noted that Plaintiff had developed some additional symptoms of muscular weakness and atrophy.  (R. 345.)   Concerned about a possible systemic neurological problem, Dr. Reidy referred Plaintiff to Dr. Busis, a neurologist, for further evaluation.  (R. 349.)  In a letter to Dr. Busis, dated March 3, 2003, Dr. Reidy noted that although Plaintiff initially did well, over the last six (6) months, he had experienced some recurrence of symptoms and some apparent progressive weakness in his left arm.  (R. 349.)  Dr. Reidy further noted that on exam, Plaintiff had some atrophy seemingly in a 5-6 distribution.

On April 1, 2003, a consultative Disability Examination was conducted by Ellen Mustovic,

M.D., on behalf of the Pennsylvania Bureau of Disability Determination. Dr. Mustovic reported that Plaintiff's symptoms seemed to be static, neither improving nor progressing significantly, but he complained of continued neck, arm and back pain. (R. 20; 298.) Upon examination, Plaintiff demonstrated a normal gait and normal upper and lower motor strength, and there was no appearance of visible muscle atrophy. (R. 299.) Dr. Mustovic further found Plaintiff's reflexes were trace throughout and very difficult to elicit; she was unable to obtain left triceps reflex; and found light touch sensation in the left arm and leg, and limited range of motion of the cervical spine. (R. 298-99.) Dr. Mustovic concluded that Plaintiff had chronic residual symptoms of diffuse pain and weakness consistent with his surgery and problem. (R. 299.) She further noted that Plaintiff had likely reached maximum medical improvement and completed a medical source statement which the ALJ found compatible with sedentary to light work.[9] (R. 303; 20.)

A Residual Functional Capacity ("RFC") Assessment - Physical was completed by a physician on behalf of the Pennsylvania Bureau of Disability Determination (DDS) on May 13, 2003.[10] The DDS physician assessed some exertional limitations as to lifting and carrying, including upward pulling (20 pounds occasionally, 10 pounds frequently), and sitting/standing/walking with normal breaks (6 hours in an 8 hour day). (R. 324.) The DDS physician did not assess any

---

[9]      Specifically, Dr. Mustovic noted the following limitations on Plaintiff's ability to perform work-related activities: Lifting and carrying--2 to 3 pounds frequently, 10 pounds occasionally, and 20 pounds rarely; standing and walking -- 4 hours with change of position; sitting--6 hours with change of position; pushing and pulling--left arm rarely and limited upper extremities. (R. 303.) With regard to postural activities, Dr. Mustovic noted that Plaintiff could occasionally bend, kneel, stoop, crouch, and balance, however, he could never climb; and reaching was limited. (R. 304.) Dr. Mustovic noted no limitations as to handling, fingering, communication and environment, but was unable to determine whether Plaintiff was limited as to feeling, as the exam was inconclusive on this activity. (R. 304.)

[10]      The name of the DDS physician who conducted the RFC Assessment - Physical is illegible and not otherwise discernable from the record.

limitations as to pushing/pulling (including operations of hand/foot controls), posture, manipulation, vision, communication or environment.  (R. 325-27.)  In determining the RFC - Physical, the DDS physician noted Dr. Mustovic's physical capacity evaluation and the limitations she placed on Plaintiff's ability to perform work-related activities.   Nonetheless, the DDS physician rejected these limitations in determining Plaintiff's RFC - Physical, explaining that on recent observation, Plaintiff walked normally, retained adequate strength, and had no significant limitations of movement of his arms or legs.   The DDS physician also indicated that the medical evidence did not establish "significant or profound limitations" in regard to any of Plaintiff's conditions, including his history of asthma. (R. 333.) The DDS physician did note that Plaintiff had medical documentation of very mild slowing of median nerve in his right wrist with possible carpal tunnel syndrome.  (R. 332.) Based on the medical and non-medical evidence on file, the DDS physician found Plaintiff's statements regarding his significant functional limitations were not credible.[11] (R. 333.)

Dr. Busis evaluated Plaintiff on June 3, 2003, and performed an electromyography on June 25, 2003 and concluded that "abnormalities of EMG and nerve conduction are consistent with [C5-C7] radiculopathy." (R. 348.)  A follow-up cervical MRI conducted on June 17, 2003 showed post-operative changes, spondylitic changes, and discogenic changes.  (R. 345.)

In a letter dated July 18, 2003 to an insurance claims adjuster,  Dr. Reidy noted that Plaintiff's prognosis was fair, but he would likely continue to have dysfunction in the form of pain, paresthesia and weakness with reference to the cervical injury and surgery. (R. 345.) Dr. Reidy was unable to ascertain how much the permanent effects would limit Plaintiff's functional capability and

---

[11]      However, the ALJ rejected the RFC assessments completed by the DDS Physician and Psychologist in view of the record and pursuant to *SSR 96-6p* (July 2, 1996).  (R. 22.)

noted that he was deemed appropriate for light duty work.  (R.  345.)

On October 28, 2003, Dr. Busis again examined Plaintiff, finding no clear-cut motor weakness, no incoordination and improvement over the previous examination, but that deep tendon reflexes were still absent in the biceps, triceps, and knees, and there was C5-C6 sensory loss to touch in the left upper extremity.  (R. 340.)  Dr. Busis concluded that the Plaintiff "just has residual from his neck problems" and told the Plaintiff that the pain was "good" since it made it unlikely that he had motor neuron disease.  (R. 340.)

On November 17, 2003, Dr. Reidy provided an updated status report to the insurance adjuster indicating that Plaintiff continues to suffer from cervical post-laminectomy syndrome, which has consisted of intermittent neck pain and dysfunction of the left upper extremity with numbness, paresthesias, and weakness.  (R. 341.)   Dr. Reidy further noted that the Plaintiff had attempted to perform light duty work during the month of September, 2003, but was simply unable to tolerate that degree of work due to cervical discomfort.  (R. 341.)  Relying on Dr. Busis' October 28, 2003 report, Dr. Reidy opined that  Dr. Busis' findings of chronic left cervical radiculopathy and post-surgical changes were consistent with Plaintiff's complaints and seemed relatively reliable given Plaintiff's history and reported symptoms.  (R. 341.)  Dr. Reidy opined that Plaintiff's current inability to work was based on cervical post-laminectomy syndrome.  (R. 341-42.)

Following the hearing, Plaintiff's treating physician, Dr. John Reefer, stated in a letter dated May 4, 2004, that Plaintiff reported a history of fatigue which comes upon him by 11:00 a.m. to 12:00 p.m., requiring him to nap for one to two hours before continuing any activities.  (R. 352.)

According to Dr. Reefer, Plaintiff stated he is unable to function without a nap.  (R. 352.)

On June 29, 2004, Dr. Reidy provided a narrative summary regarding Plaintiff's long-term disability claim to the insurance company.  (R. 365-69.)  His report included a review of: (1)  a physical work performance evaluation summary completed on April 15, 2004, (2) a short videotape created by a private investigator conducting surveillance of Plaintiff on April 1-3, 2004, and (3) an interview with Plaintiff conducted by an insurance investigator on June 10, 2004.  (R. 366-68.)

Dr. Reidy noted that during the insurance investigator's interview, Plaintiff reported on-going subjective complaints of neck pain and left upper extremity discomfort, brought on by increased activity such as prolonged standing, prolonged sitting, or prolonged walking.  (R. 367.)  Dr. Reidy opined that Plaintiff "has persistent symptoms of left cervical post-laminectomy syndrome [and] . . . that these symptoms are referable to his prior MVA . . . His MRI findings, electrodiagnostic testing, and clinical findings of weakness and atrophy of the left upper extremity are completely consistent with this diagnosis."  (R. 367.)  Dr. Reidy further noted that in the interview, Plaintiff indicated that he developed pain when walking for approximately 10 to 15 minutes.  Dr. Reidy commented that the surveillance video did not show Plaintiff walking for anywhere near that length of time.  In addition, Dr. Reidy observed Plaintiff in the surveillance video driving a car, sitting on his lawn, and walking down a street carrying a small shovel (*i.e.,* pooper scooper) in his right hand with a friend who was walking a dog.  (R. 368, 363.)   Dr. Reidy disagreed with the insurance company representative who suggested that the video shows Plaintiff performing at a higher level than what the medical records and Plaintiff report.  (R. 368.)  Dr. Reidy opined that he found no

discrepancy between Plaintiff's reported restrictions and the activities observed in the video.  (R. 368.)  Dr. Reidy further opined that Plaintiff's "reports of pain have been consistent with the underlying diagnosis [and] . . . that the radiographic reports and Dr. Busis' evaluation and electrical testing that he performed also support [Plaintiff's] claims." (R. 368.)  As to the functional capacity evaluation conducted on April 15, 2004, Dr. Reidy did not dispute that Plaintiff was found to be appropriate for a full work day at a light duty level.  (R. 368.)   In fact, Dr. Reidy reported that since he has known the Plaintiff, he has found him to be appropriate to work in a light duty capacity based solely on the medical facts.  However, because of Plaintiff's unsuccessful attempt to work in a light duty capacity for twelve days, which  led to an unacceptable degree of discomfort with regard to his prior injury, Dr. Reidy concluded that it was not appropriate for Plaintiff to return to work at that time.  (R. 368-69.) Dr. Reidy did indicate that if light duty positions were made available to Plaintiff and he was willing to try, that would be a reasonable option.  (R. 369.)

The medical record also shows that since at least as far back as 1989, Plaintiff has a history of asthma for which he has been receiving treatment and is well controlled with medication (R. 106, 122-23, 126, 128, 142, 144, 153, 155, 174, 181, 290); bronchitis (R. 163, 174); and recurrent sinusitis[12] (R. 159, 165).  The Plaintiff testified at his hearing that certain smells, such as perfumes and those found in the grocery store, cause him breathing difficulties. (R. 392)  As is indicated by the medical records, the Plaintiff neither smokes nor drinks alcohol. (R. 251, 290.)

Since 1989, Plaintiff had been under the care of Dr. John Soffietti of P.B.S. Mental Health Associates, P.C., for complaints of anxiety. (R. 288.) Dr. Soffietti noted that Plaintiff met the criteria

---

[12]     With regard to the Plaintiff's complaints of recurrent sinusitis, the medical record indicates that since as early as 1998, Plaintiff's condition was being controlled with medications such as Flonase 2 sprays, and that his condition did not impose any significant functional limitations.  (R. 126, 332.)

for panic disorder, complicated by asthma and, more recently, significant traumatic degenerative disc disease.  (R. 288.)  Dr. Soffietti reported that psychiatrically, Plaintiff has done  well on his prescribed medication of Klonopin.[13]  (R. 288.)

In her Clinical Psychological Disability Evaluation of January 22, 2003, Julie Uran, Ph.D., found no abnormalities or difficulties in most of the areas tested.  (R. 290-91.)  Dr. Uran noted, however, Plaintiff had some difficulty with identifying similarities and test judgment.  (R. 291.)  Dr. Uran further noted that Plaintiff's capacity to gain insight or learn from experiences is limited.  (R. 291.)  Dr. Uran assessed a prognosis of fair to Plaintiff's higher level functioning and personality integration, and assessed a GAF score of 65.[14]  (R. 291.)  In addition, Dr. Uran evaluated Plaintiff's ability to make occupational and performance adjustments and determined Plaintiff's ability to be unlimited/very good  or good in all areas except Plaintiff's ability to deal with work stresses, which she assessed as fair, based on his Generalized Anxiety Disorder ("GAD").  (R. 293.)  As to Plaintiff's ability to make personal-social adjustments, Dr. Uran determined that his ability was unlimited/very good or good in all categories except one--ability to behave in an emotionally stable manner, which she assessed as fair.  (R. 294.)  Dr. Uran also noted some restrictions in his ability to perform activities of daily living (cleaning, shopping, and maintaining his residence) and concentration and task persistence (physical health hinders Plaintiff's ability to follow a schedule, to complete tasks,

---

[13]        Klonopin is the brand name for Clonazepam, which is used to treat seizure disorders and panic disorders. *Physicans' Desk Reference* (Thomson 2005).  A commonly observed side effect of Klonopin in panic disorders is somnolence.  *Id.*  Somnolence is defined as "drowsiness or sleepiness, particularly in excess."  *Dorland's Illus. Med. Dictionary* (30th ed. 2003) at 1723.

[14]        The GAF scale rates psychological, social and occupational functioning.  The GAF rating is the singe value that best reflects the individual's overall level of functioning at the time of examination.  American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-35 (4th ed. 1994) ("*DSM-IV*").  A GAF of 65 indicates "some mild symptoms, (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* at 32.

17

and to maintain a consistent pace).  (R. 296.)

On April 25, 2003, Larry Smith, Ph.D., completed an RFC - Mental on behalf of DDS.  (R. 319-22.)  Dr. Smith determined that with regard to understanding, memory and social interaction, Plaintiff was not significantly limited or not limited at all.  (R. 319-20.)  As to sustained concentration and persistence, Dr. Smith assessed Plaintiff as not significantly limited or no limitations in all categories but three--ability to maintain attention and concentration for extended periods; ability to complete normal workday/work week without interruptions from psychologically based symptoms; and ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances--where he rated Plaintiff as moderately limited.  (R. 319-20.)  As to adaptation, Dr. Smith assessed Plaintiff's abilities as not significantly limited in all but one category--ability to respond appropriately to changes in the work setting, which he rated as moderately limited.  (R. 320.)  Dr. Smith accorded great weight to Dr. Uran's opinion in determining that Plaintiff was capable of performing substantial gainful activity despite his anxiety-related disorder.  (R. 321.)  Having assessed only mild to moderate limitations in functioning, Dr. Smith found that Plaintiff's statements of his limitations were only partially credible.[15]  (R. 315; 321.)

Dr. Smith also assessed whether Plaintiff's mental impairment met or equalled the listing at Section 12.06 *Anxiety-Related Disorders.*  (R. 305-318.)  Dr. Smith concluded that Plaintiff's GAD was a medically determinable impairment that did not precisely satisfy the diagnostic criteria of the listing.  (R. 310.)  In his assessment of Plaintiff's functional limitations under Section 12.06, Dr. Smith found Plaintiff to have a mild degree of limitations with his activities of daily living and difficulties in maintaining social function, and a moderate degree of limitation with regard to

---

[15]     *See* note 11, *supra.*

18

difficulties maintaining concentration, persistence, or pace. (R. 315.) Dr. Smith noted that there was

insufficient evidence of episodes of decompensation of extended duration. (R. 315.)

At the hearing on April 29, 2004, the vocational expert (VE), Samuel Edelmann, M.Ed.,

testified regarding whether work exists in the national economy that can be performed by a

hypothetical claimant with Plaintiff's age, education, physical and mental impairments, past relevant

work experience, and RFC. (R. 22, 401-406.) In particular, the ALJ posed the following hypothetical

question to the VE:

> Assume that the person with whom we're dealing is 48 years of age.
> He is like high school and also college graduate with a Bachelor of
> Science degree. In a four year college. He has the same past relevant
> experience as the claimant. I'm going to ask you to assume that this
> person does indeed have asthma . . . carpal tunnel syndrome, which
> does not cause any significant limitations by itself. It is a mild right
> carpal tunnel. He is right- handed. He does have residuals of neck
> surgery, fusion at C5, C6, with residual pain and weakness. . . . [H]is
> left hand is severely impaired by his residuals. . . . His mental
> impairment is controlled on medications. And I'm going to ask you
> to assume that he has a global assessment of functioning of 65 . . ..
> Dr. Uran . . . has diagnosed a generalized anxiety disorder. She has
> assessed the claimant has the global assessment of 65. And in her
> report on the claimant's limitations, as indicated, that in almost all
> areas of work, the claimant is able to perform either unlimited or
> good. The only area there is any significant impairment is as to
> dealing with work stresses. So there is some questions about his
> ability to deal with work stress, and there is also some question about
> his ability to behave in an emotionally stable manner. I'm going to
> ask you to assume that ordinarily he can do all these jobs with no
> limitations. But occasionally he might have difficulty dealing with
> work stresses and also difficulty dealing with social situations – I'm
> sorry – behaving in an emotionally stable manner occasionally. But
> ordinarily he's able to do everything mentally. As a residual of his
> neck surgery, he also has a residual of a herniated disc in his back.
> He has atrophy of the left arm. The claimant suffers from fatigue
> according to Dr. Mustovic, and also Dr. Re[i]dy. Dr. Re[i]dy is the
> claimant's treating family physician. He reports . . . that . . . claimant
> tried to go back to work. But because of residuals to his surgery, he

> had dysfunction of his upper left extremity.  His left arm.  Numbness,
> paresthesias and intermittent weakness. . . . Dr. Re[i]dy also reports
> that the claimant's alleged limitations are credible and are consistent
> with his medical limitations.  Dr. Re[i]dy has concluded that [t]his
> person is totally disabled for employment.  An earlier report . . .
> indicates the claimant failed to be able to return to any significant
> work activity at the sedentary level.  The claimant alleges he has to lie
> down between one and two hours a day . . . he's able to dress and
> clean himself.  He can shop . . . do dishes . . . clean his home . . .
> drive.  He also indicates no impairment in concentration.  He's able
> to manage his finances and also write checks.  However, he has
> strenuously testified that he has to lie down between one and two
> hours a day.
>
> Assuming that is correct.  Would the claimant be able to
> return to any jobs available in the national economy at the sedentary
> level?

(R. 22, 404-06.)  The VE responded that at the sedentary level, given those limitations, including the need to lie down for in excess of one hour a day, there would not be any jobs available in the national economy which the hypothetical claimant could perform.  (R. 406.)

The ALJ then posed a follow-up question to the VE:  "If the claimant otherwise were (sic) able to work a full day without a need to lie down[, w]ould he be able to either return to his past jobs or any other jobs available in the national economy at the sedentary level?"  (R. 406.)  Before providing a response, the VE stated, "I'm not sure what I'm supposed to assume is credible."  (R. 406.)  The ALJ answered, "He is able to return to *all* the sedentary work."  (R. 406; emphasis added.)  In response to the follow-up questions, the VE stated:

> Okay.  Yes.  There would be work that he would be able to perform
> at the sedentary level.  Jobs would - I would suggest - telephone
> solicitor, 265,000 nationally, gate guard, 106,000 jobs nationally, or
> ticket sales entertainment, lottery tickets, 238,000 jobs nationally.

(R. 406.)  The VE added that these were all entry level jobs that required little if any use of the non-dominant arm.  Counsel for the Plaintiff declined the invitation to question the VE.  (R. 407.)

20

C.    **"Substantial Evidence" Standard of Review**

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner. 42 U.S.C. § 405(g). *See also, e.g.*, *Richardson v. Perales*, 402 U.S. 389 (1971); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (citations omitted). Although there may be contradictory evidence in the record, and/or although this Court may have found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000) (citation omitted).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (citing *Cotter v. Harris,* 642 F.2d 700, 706 (3d Cir. 1981)); *see also Gilliland v. Heckler*, 786 F.2d 178, 183 (3d Cir. 1986) (citing *Kent, supra*). In addition, despite the deference due to

administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981) (citations omitted). Finally, the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Fargnoli v. Massanari*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

## D. Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual functional capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

22

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).[16]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[17] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether it meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether the plaintiff can do his past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all the medical evidence in the file, to assess whether the plaintiff has the

---

[16]      In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. *See Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.") (citations omitted).
         In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of her daily activities. *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, *supra. See Good v. Weinberger*, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing *Bittel* and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); *see also Kephart v. Richardson*, 505 F.2d 1085, 1089 (3d Cir. 1974) (noting that credibility determinations of ALJ are entitled to deference).

[17]      This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. *See, e.g., Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

ability to perform other work existing in the national economy in light of plaintiff's age, education and past work experience.[18]

A finding by the ALJ that the plaintiff is unable to perform his past relevant work will satisfy Plaintiff's burden and the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates his residual functional capacity. *See* 20 CFR § 404.1520; *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984).[19] Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

### E.    Analysis

As noted above, Plaintiff complains on appeal that the ALJ's decision is not supported by substantial evidence and challenges it on the grounds that the ALJ erred in: (1) determining that his impairments were not severe enough to meet or medically equal one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (2) finding that his allegations regarding his limitations were not totally credible; (3) relying on a hypothetical posed to a vocational expert which failed to include the results of all of his limitations, and/or provided no justification for not including them; and (4) failing to consider all of his impairments in determining whether he retained the residual functional

---

[18]    The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (*i.e.,* one which limits the strength he can exert in engaging in work activity), and if his impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts. *See* 20 C.F.R. § 404.1569; 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a).

[19]    The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. *See Jesurum v. Sec. of U.S. Dep't of Heath & Human Serv.*, 48 F.3d 114, 121 (3d Cir. 1995).

capacity to perform a wide range of sedentary work, and/or provided no justification for not including them.  Defendant, however, argues that the Commissioner's decision to deny Plaintiff's claim for benefits is supported by substantial evidence.  Each of these arguments is addressed below.

### 1.     ALJ's Finding at Step Three:  Plaintiff's Conditions Do Not Meet or Equal the Listing in § 1.04A

At Step Three of the sequential evaluation process, the claimant bears the burden of producing medical evidence that demonstrates his impairment matches a listing or is equal in severity to a listed impairment.  *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 120 n.2 (3d Cir. 2000)(citing *Williams v. Sullivan,* 970 F.2d 1178, 1186 (3d Cir. 1992)).  "'[T]o show that his impairment matches a listing, [the claimant's impairment] must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"  *Williams,* 970 F.2d at 1186  (quoting *Sullivan v. Zebley,* 498 U.S. 521, 530-31 (1990)) (emphasis in original).

There is no question here that given the diagnosis of Plaintiff's treating physicians of degenerative disc disease of the cervical spine, Listing 1.04 A applies to Plaintiff's physical impairment.  The listing criteria for § 1.04A require that Plaintiff's degenerative disc disease be accompanied by nerve root compression.[20]  According to Part A of Listing 1.04, the following medical criteria constitute evidence of nerve root compression:

> (1)  neuro-anatomic distribution of pain,
> (2)  limitation of range of motion of the spine,

---

[20]     Listing 1.04 contains the following muscoskeletal impairments:
*1.04 Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
Listing 1.04, 20 C.F.R. pt. 404, subpt. P, app. 1.

      (3)  motor loss[21]  (atrophy with associated muscle weakness
           or muscle weakness) accompanied by
               (a) sensory loss or
               (b) reflex loss, AND
      (4)  if the lower back is involved, positive straight leg raising test.

§ 1.04A, 20 C.F.R. pt. 404, subpt. P, app. 1.  Therefore, in order for Plaintiff to have been found

disabled at Step Three of the sequential evaluation process, the evidence of record must demonstrate

the existence of *all* of the above criteria.

      In addition to establishing the presence of these criteria, Plaintiff must show that he  is unable

to perform fine and gross movements effectively for at least 12 months.  Section 1.00B2a, 20 C.F.R.

pt. 404, subpt. P, app. 1. An inability to perform fine and gross movements effectively is defined as

an "extreme loss of function of *both* upper extremities, *i.e.,*  an impairment(s) that interferes very

seriously with the individual's ability to independently initiate, sustain, or complete activities."

Section 1.00 B2c, 20 C.F.R. pt. 404, subpt. P, app. 1 (emphasis added).  For example, the extreme

loss of function requirement is met where the claimant is unable to:  (1)  prepare a simple meal and

feed himself, (2) take care of personal hygiene, (3) sort and handle papers or files, or (4) place files

in a file cabinet at or above waist level.  *Id.*

      In the case at bar, the ALJ found that the Plaintiff had degenerative  disc  disease of the

cervical spine, however, he concluded that it did not result in significant nerve root compression and

therefore was not of sufficient severity to either meet or equal the requirements contained in Listing

---

[21]     "'Motor loss' refers to muscle weakness, as objectively determined by measurement of muscle size to
determine if there is muscle wasting (atrophy).  While the presence of atrophy is more convincing of severe nerve
root compression than the subjectivity of weakness alone, part A [of Listing 1.04] clearly specifies that muscle
weakness alone is sufficient."   David A. Morton, III, M.D., MEDICAL ISSUES IN SOCIAL SECURITY
DISABILITY, § 1.04 at 1-43 (1st ed. 2003, rev. 2  3/05) ("Morton").  Muscle size is measured by "wrapping a tape
measure around the limb in question (arm or leg) to get the circumferential size." *Id.* at 1-44.  In order to be
meaningful, the circumferential measurement must be taken of both the right and left limbs, at the same distance
from the elbow or knee, and then compared.  *Id.*

1.04A. (R. 19.) Plaintiff challenges this finding on several bases. Initially, Plaintiff argues that based on the medical records, his condition meets all of the criteria of Listing 1.04A. (Pl.'s Br. at 8-9.) In support of this argument, Plaintiff cites to various parts of the record which purportedly document each of the listing criteria. In response, Defendant counters that Plaintiff cannot satisfy Listing 1.04A because the record fails to show that he had muscle weakness that lasted twelve (12) months as required by Section 1.00B2a of 20 C.F.R. pt. 404, subpt. P, app. 1. (Def.'s Br. at 9-10.) In support of this argument, Defendant points to seven medical sources who reported that at various times during the period commencing on October 19, 2001 to April 1, 2003, Plaintiff had good or full muscle or motor strength on physical examination. (Def.'s Br. at 9.) Defendant does not dispute that during this period, Dr. Reidy found muscle weakness on two occasions, but instead argues that Dr. Busis, who subsequently evaluated Plaintiff, determined that Plaintiff had "no clear-cut motor weakness," thereby establishing that Plaintiff's muscle weakness did not last for the requisite twelve-month period.

In reply to Defendant's argument, Plaintiff submits that (1) the Commissioner's use of the terms "motor strength" and "motor weakness," "as though these terms were identical with muscle weakness", is improper because those terms are not synonymous based on the differences in the Listings for musculoskeletal disorders and neurological disorders, the latter of which repeatedly refers to motor function (Pl.'s Reply Br. at 2); and (2) the documented presence of muscle weakness on three occasions, *i.e.,* September 20, 2002, March 3, 2003, and April 1, 2003, is sufficient to satisfy the one-year durational requirement. (Pl.'s Reply Br. at 3.)

Plaintiff's first argument in reply lacks merit and can be disposed of quickly. One of the criteria for Listing 1.04A is "motor loss (*atrophy with associated muscle weakness or muscle*

27

*weakness . . .."*  The plain language of the Listing indicates that for purposes of establishing musculoskeletal disorders, the presence of motor loss can be established by showing either atrophy with associated muscle weakness, or muscle weakness alone.  Moreover, a leading treatise defines "motor loss" as "refer[ing] to muscle weakness, as objectively determined by measurement of muscle size to determine if there is muscle wasting (atrophy)."[22]  David A. Morton, III, M.D., *Medical Issues in Social Security Disability,* Vol. 1, § 1.04 at 1-43 (1st ed. 2003, rev. 2  3/05) ("Morton").  Morton goes on to note that "[w]hile the presence of atrophy is more convincing of severe nerve root compression than the subjectivity of weakness alone, [Listing 1.04A] clearly specifies that muscle weakness alone is sufficient."  *Id.*  Accordingly, the Commissioner's focus on the findings of Plaintiff's treating physicians  and the other medical sources with regard to muscle weakness, or lack thereof, is not only appropriate, but necessary to his determination that Plaintiff failed to establish the presence of "motor loss."[23]

As to Plaintiff's second argument in reply, it is equally without merit.  The medical and other evidence do not support a finding that Plaintiff's functional loss in his upper extremities is extreme and/or that such functional loss lasted or is expected to last for 12 or more months.  First, although the reports of Plaintiff's treating physicians note atrophy in his left arm/biceps, none of the treating or examining physicians provide the requisite measurements.  In this regard, the Listing provides that

[22]	Despite Plaintiff's assertion to the contrary, the Court finds no confusion exists over "muscle weakness" and "motor weakness" and, therefore, clarification is not needed as suggested by Plaintiff.  (Pl.'s Reply Br. at 3.)

[23]	Plaintiff also takes issue with the focus in the Defendant's brief in support of summary judgment on lack of "muscle weakness" to support the ALJ's conclusion that Plaintiff's impairment did not result in significant nerve compression, suggesting this legal argument may be improper as it was not based on the conclusions drawn by the ALJ.  (Pl.'s Reply Br. at 2 n. 1.)  The Court finds no merit to Plaintiff's argument.  Although not specifically noted by the ALJ in his decision, muscle weakness is one of the criteria that must be present to establish nerve root compression and thus meet the Listing for *Disorders of the spine*.  *See* Listing 1.04 A, 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ's ultimate finding follows  *a fortiori* from Plaintiff's failure to satisfy all of the Listing criteria, one of which is muscle weakness.

"a report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both upper and lower arms, as appropriate, at a stated point above and below the . . . elbow given in inches or centimeters.  Additionally, a report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength."  Section 1.00C1 of 20 C.F.R. pt. 404, subpt. P, app. 1.  In this case, circumferential measurements of Plaintiff's arms either were not taken, or if taken, were not reported in the treatment notes for purposes of documenting atrophy.  Therefore, the reported atrophy cannot be considered evidence of significant motor loss.  Thus, the remaining question is whether the muscle weakness reported by Plaintiff's treating physicians and other medical sources was so severe as to result in extreme loss of function of *both* upper extremities.

The record does not support a finding of extreme loss of function in *both* upper extremities, lasting for at least twelve (12) months.  Rather, the record clearly establishes that Plaintiff's muscle weakness was limited to his left upper extremity and was intermittent.  Beginning with the surgery on October 18, 2001 (following the motor vehicle accident), to October 28, 2003, the record shows no muscle weakness and/or good or full muscle strength on ten (10) occasions.  (R. 249, 286, 273, 282-83, 109, 263, 286, 261, 297-300, 340.)  During that same time period, Plaintiff's medical sources reported findings of muscle weakness on two occasions, *i.e.,* September 30, 2002, and June 25, 2003.  (R. 262, 348.)  In addition, in a letter to an insurance adjuster regarding Plaintiff's condition, Dr. Reidy indicated on July 28, 2003 (R. 345) that as a result of his cervical post-laminectomy syndrome, Plaintiff had *intermittent* dysfunction of his left upper extremity, but nonetheless indicated that Plaintiff could return to work in a light capacity.  This evidence supports the ALJ's finding that

Plaintiff's impairment, degenerative disc disease of the cervical spine, was not of sufficient severity to either meet or equal the requirements of Listing 1.04A.

Next, Plaintiff argues that since his treating physicians do not agree totally as to each of the nerve root compression criteria, the ALJ should have sought clarification from the treating physicians or obtained an opinion from another medical source. In support of this argument, Plaintiff cites 20 C.F.R. §404.1512(e)(1), which provides, in essence, that the Commissioner must seek additional evidence or clarification from a client's medical source when the report from that medical source contains a conflict or ambiguity that must be resolved.  Plaintiff also cites *Claussen v. Chater,* 950 F.Supp. 1287, 1295 (D.N.J. 1996) (citing *Ferguson v. Schweiker,* 765 F.2d 31, 36-37 n.4 (3d Cir. 1985)), for the proposition that if an ALJ finds a treating physician's report is conclusory or unclear, the ALJ is required to secure additional evidence from another physician.  (*See* Pl.'s Br. at 9.; *see also* Pl.'s Reply Br. at 2-3.)

The Court finds that this argument is simply without merit.  The portions of the medical reports identified by Plaintiff are neither ambiguous nor conflicting.[24] Nor does Plaintiff show where, at Step Three, the ALJ ever "found that a treating physician's report is conclusory or unclear. Indeed, the record shows no ambiguity or conflict, but rather, that during various physical examinations, Plaintiff's motor strength and/or loss, cervical spine range of motion, atrophy and/or muscle

---

[24]       Plaintiff relies on Dr. Reefer's medical findings on 9/24/01 citing "mild cord compression" and "cervical radiculopathy bilaterally with some cord compression." (Pl.'s Br. at 10; R. 113.) These findings are not inconsistent with Dr. Reefer's earlier findings on 9/20/01 noting that "[a]t the levels of C3-4 and C4-5, there are mildly, diffusely bulging discs [which] minimally efface the anterior CSF space but do not cause any cord compression," (R. 222), as he further found that "[a]t the level C6-7, posterior endplate spurs [were] also present," along with "disc protrusion," but these "[did] not cause significant cord compression." (R. 222.) "[A]t C5-6" Dr. Reefer found that "there [was] mild cord compression." (R. 222.) Plaintiff also points to the repeated diagnoses of radiculopathy by neurologist, Dr. Neil Busis, M.D., (Pl.'s Br. at 10; R. 108, 109, 113, 115), and argues that this evidence provides proof that his degenerative disc disease resulted in nerve root compression.  As explained earlier, however, Plaintiff must prove the presence of *all* of the Listing criteria, not simply that his condition resulted in nerve root compression.

weakness, and sensory or reflex response  were sometimes better and at other times worse, *i.e.,* that the dysfunction was intermittent.   Indeed, that is exactly how Dr. Reidy described Plaintiff's condition.  (R. 345.) Certainly, even after  Plaintiff's symptoms worsened two years after his surgery, the uncontradicted medical evidence shows he did not sustain an extreme loss of function in *both* upper extremities of at least 12 months duration, as required in Section 1.00B2a and 1.00B2c of 20 C.F.R. pt. 404, subpt. P, app. 1.

Finally, Plaintiff asserts that Listing 1.04A does not require "significant" nerve root compression as the ALJ stated, but rather, a showing of unqualified "nerve root compression," the presence of which he asserts is indicated by Dr. Reefer's findings of nerve compression, repeated diagnoses of radiculopathy, and Dr. Reidy's findings of muscular weakness in the left arm.  (Pl.'s Reply Br. at 2-3.)  The listing criteria for the musculoskeletal system in effect at the time of the ALJ's decision[25] no longer use the word "significant" to describe nerve root compression, but rather, requires that the criteria be evaluated in terms of loss of function, describing the requisite level of loss of function as "extreme." Section 1.00B2c of 20 C.F.R. pt. 404, subpt. P, app. 1; *see also* 66 Fed. Reg. 58010-01 (Nov. 19, 2001).  Given that the functional loss must be extreme, the fact that the ALJ used the term "significant" in assessing the severity of Plaintiff's nerve root compression does not alter the outcome at Step Three.

Accordingly, the Court finds that the ALJ's decision at Step Three is supported by substantial evidence.

---

[25]     Plaintiff filed his claim in December of 2002, and as such, the ALJ was required to consider his impairments under the revised listing for musculoskeletal system published at 66 Fed. Reg. 58010 (Nov. 19, 2001), effective February 19, 2002.  (R. 19.)

## 2.    Additional Alleged Legal Errors By ALJ At Step Three

Next, Plaintiff raises two additional arguments with regard to Step Three:  That the ALJ erred as a matter of law in (1) relying on the absence of an opinion from a medical source regarding whether Plaintiff's conditions met or medically equaled a listing, and (2) failing to make a finding that Plaintiff did not have a combination of impairments that equaled a listing.  For the reasons set forth below, Plaintiff's arguments completely miss the mark.

First, Plaintiff argues that the ALJ erred as a matter of law in basing his conclusion at Step Three on his finding that "no physician, psychologist, psychiatrist, or other caregiver has assessed that the claimant's conditions either meet or equal any of the listings." (R. 19.)  Plaintiff submits that the question of whether a listing is met or equaled is a legal question which either the ALJ or the Appeals Council is responsible for making, citing *SSR 96-6p*.  (Pl.'s Br. at 15.)  Therefore, Plaintiff argues, it was improper for the ALJ to base his opinion (in the absence of any other assessment) as to whether the listing was met or equaled on the fact that no medical source stated Plaintiff's conditions equaled a listing.  (Pl.'s Br. at 15.)

Plaintiff's argument is nothing more than a red herring.  It is clear from the ALJ's decision that he reviewed the entire record, including the reports of all of the medical sources and caregivers, in making his determination that Plaintiff's impairments did not meet or equal a listing at Step Three. (R. 20-21.)  The ALJ merely notes the absence of any finding from a medical source or caregiver as to whether Plaintiff's conditions met or equaled a listing, and it is not the sole, nor even primary, basis for his finding at Step Three.  In any event, the ALJ made the ultimate decision at Step Three in accordance with *SSR 96-6p*.  Accordingly, the Court finds no merit to Plaintiff's argument.

Equally without merit is Plaintiff's other argument that the ALJ, in his Findings, "made no

finding that the claimant did not have a combination of impairments that equaled a listing, (R. 23),"

or that the ALJ did not address this issue in the body of his opinion. (Pl.'s Br. at 16.) A review of

the ALJ's decision simply does not bear out Plaintiff's argument. The ALJ clearly considered

whether the combination of Plaintiff's impairments met or medically equaled a listing at Step Three

(R. 19), and issued a finding regarding same (Finding Nos. 3 & 4, R. 23). Thus, the Court finds that

there is no basis for finding that the ALJ erred as a matter of law in determining at Step Three that

Plaintiff's combination of impairments did not meet or medically equal one of the listed impairments

in 20 C.F.R. pt. 404, subpt. P, app. 1.

### 3. The ALJ's Credibility Finding as to Plaintiff's Complaints of Limitation Is Not Supported by Substantial Evidence

Next, Plaintiff submits the ALJ erred in failing to make proper credibility findings regarding

his testimony. The ALJ gave the following explanation for finding Plaintiff's complaints not fully

credible: "I find that the claimant's allegations regarding his limitations are not totally credible for

the reasons set forth in the body of the decision." (Finding No. 5, R. 23.) In reviewing the body of

the decision, the only possible bases for the ALJ's credibility determination are provided on page

4 of the ALJ's decision:

> In assessing the claimant's residual functional capacity, I have considered not only the objective clinical findings, but also the claimant's subjective assertions with respect to pain and other symptoms. I observed the claimant at his recent hearing and noted that while he stood after about 45 minutes, he otherwise showed no signs of significant physical or mental distress, and was able to present his case in a reasonable fashion.

> The claimant uses several medications for his post-cervical laminectomy syndrome and anxiety, which have been beneficial. Furthermore, I find no indication that they result in significant adverse side effects which would further impair the claimant's

33

concentration or otherwise interfere with his ability to perform at least sedentary work. The claimant has some signs of clinical atrophy involving the left upper extremity, and has symptoms involve his left arm, but his testimony indicates that he is right-hand dominant. Since his surgery, the claimant has continued to require only conservative medical treatment for his physical complaints as well as his anxiety. I note also that despite the claimant's assertions of total disability, his testimony indicates that he is able to do a full range of daily activities, use a computer, walk his dog, care for all of his personal needs, shop, do the dishes, clean house, drive, cook, and handle finances. Furthermore, the report from Doctor. Mustovic (Exhibit 10F) indicates that the claimant is able to do some outside work with the help of his children, do the dishes, help with the laundry, and drive. Based on my review of the entire record, I conclude that despite the claimant's impairments, he nonetheless appears capable performing a wide range of sedentary work.

(R. 21.)

Plaintiff presents the following arguments in challenging the ALJ's credibility determination: (1) The ALJ had an intent throughout the hearing to portray Plaintiff as a liar; (2) the ALJ inappropriately engaged in "sit and squirm" jurisprudence, thereby substituting his opinion for that of a treating physician; and (3) the ALJ failed to give specific reasons for his credibility finding, supported by evidence in the record, and failed to specifically state the weight given to his statements, and determine that none, some, or all of his statements are fully credible or credible to a certain degree, in contravention of the directive of *SSR 96-7p* (July 2, 1996). Each of Plaintiff's arguments is addressed below.

In response, Defendant counters that Plaintiff's allegations of error regarding the ALJ's credibility determination have no merit because significant inconsistencies exist between Plaintiff's claim that he is disabled from all work in the national economy and the record evidence, and

therefore, the Court should defer to the ALJ's credibility finding.  (Def.'s Br. at 13.)  In particular,

Defendant argues that under the two-step process for evaluating symptoms such as pain set forth in

the regulations, the evaluation of subjective complaints requires an assessment of the extent to which

a claimant is accurately relating the degree of his subject symptoms or the extent to which they are

disabling.  (Def.'s Br. at 15.)  In support of this argument, Defendant cites *Hartranft v. Apfel,* 181

F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)).  In *Hartranft,* the ALJ found that

although the claimant had been diagnosed with a medical condition that could reasonably cause his

pain, his testimony regarding the extent of his pain was exaggerated and claimant could perform light

duty work despite his complaints of incapacitating pain.  *Id.*  The Court of Appeals found the ALJ's

ruling was supported by substantial evidence because the "ALJ cited specific instances where

[claimant's] complaints of pain and other subjective symptoms were inconsistent with: 1) the

objective medical evidence of record; 2) [claimant's] testimony as to his rehabilitation and

medication regimen; and 3) [claimant's] own description of his daily activities."  *Id.*  Defendant

contends that a finding similar to that made in *Hartranft* would be appropriate here because the ALJ

closely complied with the regulations.  As explained below, however, the Court finds the ALJ did

not closely comply with the regulations and *SSR 96-7p* in evaluating Plaintiff's credibility, and

*Hartranft* is distinguishable on the facts.

### a.     ALJ's Bias Against Plaintiff

In his first argument, Plaintiff alleges that the ALJ had an intent throughout the hearing to

portray Plaintiff as a liar, as evidenced by the following remarks of the ALJ:[26]

---

[26]      The Court notes that the record contains additional biased comments made by the ALJ during the hearing.
The ones referenced present a sample of the biased remarks.

(1)  The ALJ remarked he looked in the file and did not see any indication that Plaintiff was ever diagnosed with asthma, and when Plaintiff's counsel was unable to cite to the specific notations in the record of Plaintiff's asthma, the ALJ then remarked he would find Plaintiff had testified falsely if a review of the record failed to show that Plaintiff had been diagnosed with and/or treated for asthma (R. 387)[27];

(2) In his decision, the ALJ described the post-hearing letter from Plaintiff's treating physician, Dr. Reefer, as a "sham" and "self-serving"[28]; and,

(3) During the hearing, when told by Plaintiff's counsel that there did not appear to be any functional capacity assessment from Plaintiff's physical therapist in the record, the ALJ responded, "the problem is, counsel, that the more we go into intangibles, that there's no corroboration of, the less credibility the claimant has in the proceedings.  I'm not saying that he's misrepresenting anything.  The problem is that we have nothing to [s]how that he has to lie down or that he has muscle spasms, et cetera, . . .."  (R. 396-97.)

Plaintiff contends the above remarks made by the ALJ lacked any foundation and cites to various parts of the record which document that (1) his asthma was diagnosed and consistently treated over the years by four different treating physicians; (2) his tiredness, fatigue and sleepiness were mentioned repeatedly as brought on by both insomnia and the side effects from medications; and (3) his muscle spasms and tenderness to palpation were observed by his treating physicians.  (Pl.'s Br. at 17.)

In social security cases, although the hearing is informal, it is still governed by due process requirements.  *Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir. 1995) (citing *Richardson v. Perales,*

---

[27]     The Court, upon its own review of the record, found at least 11 documented notations in the record regarding the diagnosis and treatment of Plaintiff's asthma.  (R. 117, 119, 123, 126, 128, 130, 134, 273, 282, 298, 333.)  The Court is perplexed as to how the ALJ could have missed so many references to Plaintiff's asthma, thus calling into question the thoroughness of the ALJ's review.

[28]     The letter from Dr. Reefer related Plaintiff's complaints of fatigue and the need to lie down for one to two hours a day (R. 352), and was provided in direct response to the ALJ's inquiry at the hearing as to what support existed for Plaintiff's complaints.

402 U.S. 389, 401-02 (1971)).  The Social Security Act and the regulations promulgated thereunder

provide for fair procedures.  *Id.* (citing *Hess v. Sec'y of Health, Educ. & Welfare,* 497 F.2d 837, 840-

41 (3d Cir. 1974) (other citation omitted)).  Moreover, the right to an unbiased judge is essential to

a fair hearing.  *Id.*  (citing *Hummel v. Heckler,* 736 F.2d 91, 93 (3d Cir. 1984)).  In administrative

proceedings, the due process requirement is applied more strictly due to the lack of procedural

safeguards normally available in judicial proceedings.  *Id.* (citing *Hummel,* 736 F.2d at 93).  In social

security cases, the right to an unbiased ALJ is of particular importance because of the active roles

ALJs take in those proceedings.  *Id.* (citing *Hess,* 497 F.2d at 840-41).  Indeed, ALJs are obligated

to develop a full and fair record, which includes all relevant information regarding a claimant's

entitlement to social security benefits.  *Id.* (citing *Brown v. Shalala,* 44 F.3d 931, 934 (11th Cir.

1995); *Smith v. Harris,* 644 F.2d 985, 989 (3d Cir. 1981)).  With this background in mind, the Court

turns now to Plaintiff's claim that the ALJ displayed bias against him at the hearing.

The Court has reviewed the hearing testimony and finds the ALJ's remarks were completely

out of line and show a bias against Plaintiff, which may have unfairly impacted the ALJ's credibility

determination.  The Court's own review of the record reveals at least eleven documented notations

in the record of a diagnosis and treatment for asthma.  (R. 117, 119, 123, 126, 128, 130, 134, 273,

282, 298, 333.)  Moreover, the record contains the following documentation regarding Plaintiff's

complaints of fatigue, drowsiness and/or insomnia, and treatment of same.  Plaintiff complained of

insomnia or problems sleeping and fatigue resulting from pain affecting his ability to think and

concentrate, in the Daily Activities Questionnaire ("DAQ") completed on December 18, 2002.  (R.

95.)  Also, in the DAQ, Plaintiff indicated that his medications cause drowsiness and sleepiness (R.

96), and that he was currently taking Motrin 400 m.g. to 800 m.g. twice daily and Ultram 50 m.g.

up to two times a day for pain, and Klonopin .5 m.g. twice daily to help with sleep  (R. 95). According to the *Physicians' Desk Reference* (Thomson 2005), somnolence is a common side effect of both Ultram[29] and Klonopin[30].

The record further shows that on April 29, 2002, Dr. Reidy placed Plaintiff on Neurontin[31] as suggested by Dr. Soffietti, Plaintiff's treating psychologist.  (R. 269-70.)  On May 22, 2002, Dr. Uselman (neurosurgeon) notes that Plaintiff has been placed on Neurontin and is able to sleep now. (R. 282.)  On July 8, 2002, Dr. Reidy noted Plaintiff takes Neurontin at bedtime to assist with sleep. (R. 263.)  However, by December 18, 2002, Plaintiff was no longer taking Neurontin, as he was unable to tolerate it because it was causing dizziness.  (R. 97.)  On January 22, 2003, Dr. Julie Uran, who conducted a clinical psychology disability evaluation, noted Plaintiff's additional problems include insomnia.  (R. 290.)  As of May 13, 2003, Plaintiff was still taking Motrin, Ultram and Klonopin to help relieve the pain with some resulting drowsiness, as reported by Plaintiff to the DDS physician who conducted the RFC - Physical.  (R. 333.)  In a letter to a claims adjuster dated July 18, 2003, Dr. Reidy states that he tried Plaintiff on medication to assist with sleep.  (R. 344.)  At the hearing on April 29, 2004, Plaintiff testified that when he takes Flexeril[32] for pain, it makes him sleepy, and the side effects from the other medications he takes mostly cause sleepiness.  (R. 394.) According to the *Physicians' Desk Reference*, the most frequent side effect of Flexeril is drowsiness.

Based on these notations in the record, the Court finds that the treatment records establish

---

[29]      Ultram is a centrally acting analgesic, and is indicated for the management of moderate to moderately severe pain in adults.  In addition to analgesia, Ultram may also produce dizziness, somnolence, nausea, constipation, sweating and pruritus.  *Physicians' Desk Reference* (Thomson 2005).

[30]      *See* Note 13, *supra.*

[31]      Dizziness and somnolence are common side effects of Neurontin.  *See Physicians' Desk Reference* (Thomson 2005).

[32]      Flexeril is prescribed as an "adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions."  *See Physicians' Desk Reference*.  In addition to drowsiness, common side effects of Flexeril include dry mouth, fatigue, and headaches.  *Id.*

that Plaintiff received treatment for insomnia in the form of prescription medication (Neurontin), beginning at or around April 29, 2002; however, Plaintiff stopped taking the Neurontin sometime before he filed his claim for disability on December 18, 2002, due to his intolerance to it.  After going off the Neurontin, the record shows that Plaintiff again complained of problems with insomnia.  In addition, there is no indication in the ALJ's decision that he considered the effect of Plaintiff's insomnia, *i.e.,* fatigue, together with the side effects from the Ultram, Flexeril, and Klonopin, which all cause drowsiness.  Together the side effects from Plaintiff's medications and the untreated insomnia provide a clinical basis for Plaintiff's complaints of fatigue, and therefore, the ALJ should have considered whether which supports Plaintiff's claimed need to nap for one to two hours a day was reasonably consistent with his insomnia and the side effects of his medications.[33] Accordingly, the ALJ's conclusion that there is "no indication that [Plaintiff's medications] result in significant adverse side effects which would further impair the claimant's concentration or otherwise interfere with his ability to perform at least sedentary work" is not supported by the record.  (R. 21.)

The record also shows that the ALJ's characterization of Dr. Reefer's letter dated May 4, 2004 (R. 352) in his decision is not only inaccurate, but misconceived.  In his May 4, 2004 letter, Dr. Reefer stated that he "had the opportunity to review Mr. Ferrari in regards to his previous cervical injury and surgery [on May 4, 2004] in the office.  He reports history of fatigue.  This comes on him by 11 a.m. to 12 noon.  It is so severe that it necessitates him napping for 1-2 hours before he is able

---

[33]     The regulations do not  require that the record contains evidence in the form of a statement from a treating physician specifically stating that Plaintiff's physical impairments require that he nap one to two hours a day in order for the ALJ to have included this limitation.  All that is required is some clinical findings and/or other objective medical evidence to show that Plaintiff has medical impairments which could reasonably be expected to produce such a limitation.  20 C.F.R. §§  404.1529(a) & 416.929(a); *see also Schwartz v. Halter,* 134 F.Supp.2d 640, 653 (E.D.Pa. 2001) (citing *Green v. Schweiker,* 749 F.2d 1066, 1070-71 (3d Cir. 1984)); *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted).  Because the objective medical evidence and clinical findings support such an expectation here, the ALJ should have considered whether Plaintiff's fatigue, to the extent of requiring daily naps, is reasonably consistent with Plaintiff's insomnia in combination with the side effects of his medications..

to continue any further activities.  He states without this nap he is unable to function."  (R. 352.) Based on this letter, the ALJ found Dr. Reefer "reported that *since the hearing* the claimant complained of fatigue and is required to lie down for one to two hours a day because he cannot function otherwise . . .."  (R. 21; emphasis added.) In addition, the ALJ found that Dr. Reefer's statement is not supported by treating records or results of any clinical findings or other evidence and therefore is "self-serving" and "clearly a sham."  The ALJ's findings are problematic on two fronts. First, calling Dr. Reefer's statement "self-serving" and "clearly a sham" is completely unwarranted, especially since the ALJ suggested that Plaintiff "get something to corroborate that [he] really, really, really needs to lie down from a treating source."  (R. 407.)  Moreover, it is clear from Dr. Reefer's letter that he is merely relating what Plaintiff told him, and not making a clinical finding or diagnosis, or rendering an opinion. Second, and perhaps more importantly, the record shows that Plaintiff's complaints of fatigue predate the hearing and are supported by the records of his treating physicians, as noted above.  Therefore, for the ALJ to find that Dr. Reefer's statements in his May 4, 2004 letter were "self-serving" and "clearly a sham" is both unfounded and again indicative of possible bias on the part of the ALJ.  Accordingly, to the extent the ALJ improperly characterized Dr. Reefer's letter as a sham and based his determination of Plaintiff's credibility on such characterization, the ALJ's credibility determination is not based on substantial evidence.

b.      "Sit and Squirm" Jurisprudence

In his next argument, Plaintiff submits that the ALJ, in making his credibility assessment,

inappropriately engaged in "sit and squirm" jurisprudence,[34] and in essence, substituted his opinion for that of a treating physician.  (Pl.'s Br. at 17-18.) .  According to Plaintiff, the ALJ engaged in "sit and squirm" jurisprudence when he stated: "I observed the claimant at his recent hearing and noted that while he stood after about 45 minutes, he otherwise showed no signs of significant physical or mental distress, and was able to present his case in a reasonable fashion."  (R. 21.)  Plaintiff argues that the Courts of Appeals for the Second, Fourth, Sixth, Seventh, Eighth and Ninth Circuits[35] have criticized the use of such jurisprudence in assessing a claimant's credibility.  (Pl.'s Br. at 18.)  In support of this argument, Plaintiff cites *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) (citing *McBrayer v. Sec'y of Health & Human Serv.,* 712 F.2d 795, 799 (2d Cir. 1983))[36]; and *Trudell ex rel. Bushong v. Apfel,* 130 F.Supp.2d 891, 898 (E.D. Mich. 2001) (citing *King v. Heckler,* 742 F.2d 968, 975 n.2 (6th Cir. 1984) ("where all the medical evidence consistently supports the applicant's complaint of severe back pain, as here, the ALJ's observation of the applicant at the hearing will not provide the underpinning for denial of Social Security benefits.")) (other citations omitted).[37]  The Court finds merit to this argument.

The use of "sit and squirm" jurisprudence has been roundly criticized by the Courts of

---

[34]    Under the "sit and squirm" method of deciding disability cases, "'an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing.  If the claimant falls short of the index, the claim is denied.'" *Van Horn v. Schweiker,* 717 F.2d 871, 874 n. 3 (3d Cir. 1983) (quoting *Freeman v. Schweiker,* 681 F.2d 727, 731 (11th Cir. 1982)).

[35]    Except for the Sixth Circuit, Plaintiff fails to provide any citations to any authority from these Courts of Appeals.

[36]    The *Balsamo* case did not involve inappropriate application of "sit and squirm" jurisprudence.  Rather, in that case, the ALJ impermissibly substituted his own expertise for that of the physicians.  142 F.3d at 81.

[37]    In *Trudell,* the ALJ's decision finding no marked impairment in concentration, persistence or pace was based in part on his own observations and interpretation of claimant's conduct at the hearing.  130 F.Supp.2d at 895. In that situation, the district court concluded that "the ALJ's reliance on his personal observations . . . was more akin to those of a medical or psychological expert assessing symptoms of a patient or examinee, and then drawing conclusions therefrom. . . . [and] analogous to the so-called 'sit and squirm' test".  130 F.Supp.2d at 898 (quoting *King v. Heckler,* 742 F.2d 968, 975 n.2 ( 6th Cir. 1984)).

Appeals, including the Third Circuit.[38]  The Third Circuit has condemned the use of the "sit and squirm" jurisprudence where the *sole* basis for the ALJ's decision of *non-disability* was his lay observation of the claimant at the hearing.  *See Van Horn,* 717 F.2d at 874 & n. 3; *Pachilis v. Barnhart,* 268 F.Supp.2d 473, 482 (E.D.Pa. 2003) (citing *Kelly v. R.R. Ret. Bd.,* 625 F.2d 486, 494 (3d Cir. 1980)) (emphasis added).  In *Van Horn,* all of the medical and non-medical evidence was uncontradicted and supported the claimant's claim that he was emotionally disabled, yet the ALJ ignored this evidence in favor of his own conclusion that the claimant had no emotional disability.  *Id.* at 873-74.  The Court of Appeals rejected the ALJ's finding of non-disability because it concluded that the ALJ could only have reached his determination of non-disability by relying *solely* on his own non-expert observations at the hearing, or in other words, by relying on the prohibited "sit and squirm" jurisprudence.  *Van Horn,* 717 F.2d at 874 (citing *Freeman v. Schweiker,* 681 F.2d 727, 731 (11ᵗʰ Cir. 1982) ("The ALJ's decision improperly suggests that unless the pain is visible to the ALJ at the hearing, it is proper to deny the claim.")).

In *Pachilis,* the district court acknowledged that the Court of Appeals "'has . . . refused to permit an ALJ's lay observation that a claimant appears healthy to constitute substantial evidence supporting the ALJ's ultimate finding of physical nondisability.'" 268 F.Supp.2d at 482 (quoting *Kelly,* 625 F.2d at 494).  However, the district court went on to note that the Court of Appeals has allowed an ALJ to consider his own observations of the claimant in assessing the claimant's credibility and such credibility determination cannot be second-guessed by the court.  *Id.* (citing

---

[38]        Although the Court's decision may be informed by the cases cited by Plaintiff from other circuits, this Court is bound only by the decisions of the Supreme Court and the Court of Appeals for the Third Circuit.

*Morales v. Apfel,* 225 F.3d 310, 318 (3d Cir. 2000)[39]).  Applying this law to the facts in *Pachilis,* the district court concluded that the ALJ's reliance on his own pre-hearing observations of the claimant did not constitute prohibited "sit and squirm" jurisprudence, but rather, constituted substantial evidence of the claimant's credibility.  268 F.Supp.2d at 483.  The district court reached this conclusion based on its findings that (1) the ALJ's observations were primarily directed at the claimant's credibility vis a vis her alleged need to use an arm brace and this was only one nondispositive factor bearing on the ALJ's decision to reject the opinion of the claimant's treating physician, and (2) the overwhelming majority of the medical evidence supported the ALJ's rejection of the treating physician's opinion.  *Id.* at 482-83.

Although at first blush the ALJ here appears to be considering his own observations of Plaintiff at the hearing in assessing Plaintiff's credibility, his finding goes beyond a credibility assessment.  The ALJ's comments are more closely akin to medical opinion regarding Plaintiff's physical and mental limitations, going to the ultimate finding of non-disability.  The Court reaches this conclusion because it appears that none of the medical evidence supports the ALJ's decision.  In addition, the other bases relied on by the ALJ, *i.e.,* the ALJ's finding that Plaintiff's testimony indicates he can do a full range of daily activities, either are not supported by the record, or the proffered bases, *i.e.,* the ALJ's finding that Plaintiff continues to require only conservative medical treatment for his physical complaints, or that Doctor Mustovic indicated Plaintiff can do certain activities with assistance, are not really bases at all.  *See* discussion *infra* in Part c.  Consequently, the Court finds the ALJ impermissibly engaged in "sit and squirm" jurisprudence.

---

[39]    The Court of Appeals in *Morales* further opined that an ALJ's own observations of the claimant "alone do not carry the day and override the medical opinion of a treating physician that is supported by the record."  225 F.3d at 318.

Moreover, to the extent the ALJ relied on his observations of Plaintiff at the hearing to discredit Plaintiff's statements regarding his limitations, such reliance is misplaced because an ALJ's observations alone cannot override the medical opinion of a treating physician that is supported by the record. *Morales,* 225 F.3d at 318. Here, Dr. Reidy's opinion as to Plaintiff's limitations is supported by the MRIs and electrodiagnostic tests and clinical findings, and is essentially uncontradicted. Therefore, to the extent the ALJ's credibility determination was based on his observations of Plaintiff at the hearing, such reliance was misplaced.

### c.      The ALJ Failed to Follow SSR 96-7p

Plaintiff's third and final allegation of error is that the ALJ failed to follow the directive of *SSR 96-7p* in that he failed to: (1) give specific reasons for his credibility finding, supported by evidence in the record, (2) specifically state the weight given to Plaintiff's statements, and (3) determine that none, some, or all of Plaintiff's statements are fully credible or credible to a certain degree. (Pl.'s Br. at 21.) After reviewing the entire record, the Court is constrained to agree with Plaintiff.

The ALJ is required to consider a claimant's subjective complaints and the extent to which those complaints can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record in making a determination of a claimant's residual functional capacity. *Schwartz v. Halter,* 134 F.Supp.2d 640, 653 (E.D.Pa. 2001) (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)). The ALJ is obligated to seriously consider subjective complaints of pain or other symptoms,[40] even where those complaints are not supported by objective evidence. *Id.* (citing *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d

---

[40]      Subjective complaints are not limited to pain, but may also include other symptoms, such as fatigue, shortness of breath, weakness or nervousness.  20 C.F.R. §§ 404.1529(b), 416.929(b).

Cir. 1985))).  Although objective evidence of pain or other symptoms is not required, objective

medical evidence must show the claimant has a medical impairment(s) which could reasonably be

expected to produce the pain or other symptoms.  *Schwartz,* 134 F.Supp.2d at 653 (citing *Green v.*

*Schweiker,* 749 F.2d 1066, 1070-71 (3d Cir. 1984)); *Ferguson,* 765 F.2d at 37 (citation omitted).

If medical evidence exists that supports a claimant's complaints of pain or other symptoms, the

complaints are entitled to great weight and may not be disregarded unless contrary medical evidence

exists.  *Schwartz,* 134 F.Supp.2d at 653-54 (citing *Mason,* 994 F.2d at 1067-68 (citing *Carter v. R.R.*

*Ret. Bd.,* 834 F.2d 62, 65 (3d Cir. 1987); *Ferguson,* 765 F.2d at 37)).  In addition, when a claimant's

subjective testimony of his inability to perform even light or sedentary work is supported by

competent medical evidence, the ALJ is required to give great weight to the claimant's testimony.

*Id.* at 654 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 433 (3d Cir. 1999)) (other

citation omitted).

The regulations set forth a two-step process for evaluating symptoms, such as pain and

fatigue, and the extent to which the claimant's symptoms affect his ability to do basic work activities.

First, the ALJ must consider whether there is objective medical evidence in the record of a physical

or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other

symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); *SSR 96-7p.*  Second, once an underlying physical

or mental impairment(s) that could reasonably be expected to produce the symptoms has been

established, then the ALJ must evaluate the intensity, persistence, and limiting effects of these

symptoms on a claimant's ability to do basic work activities. 20 C.F.R. §§404.1529(c), 416.929(c);

*SSR 96-7p.*   If there is no medically determinable physical or mental impairment(s), or if there is a

medically determinable physical or mental impairment(s) but the impairments could not be

reasonable expected to product the claimant's symptoms, then the symptoms cannot be found to affect the claimant's ability to do basic work activities.  20 C.F.R. §§404.1529(b), 416.929(b); *SSR 96-7p.*

In evaluating the intensity and persistence of a claimant's symptoms, the ALJ must "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], his treating or examining physician or psychologist, or other persons about how [the] symptoms affect [the claimant], . . . and the medical opinions of [the claimant's] treating source and other medical opinions."   20  C.F.R.  §§ 404.1529(c)(1), 416.929(c)(1).   The ALJ must also consider and weigh all of the non-medical evidence such as information about the claimant's prior work record, observations by SSA employees and other persons.  20 C.F.R. §§  404.1529(c)(3), 416.929(c)(3); *Burnett,* 220 F.3d at 122 (citations omitted); *Hartranft,* 181 F.3d at 362 ("Subjective complaints require an assessment of the extent to which a claimant is accurately relating the degree of his symptoms or the extent to which they are disabling.").  Finally, the ALJ must take into consideration factors relevant to the claimant's pain or other symptoms, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the  symptoms; (5) treatment, other than medication, received for relief of the symptoms; (6) measures used to relieve the symptoms; (7) other factors relating to the claimant's functional limitations and restrictions due to the symptoms.  *Id.*

In addition, *SSR 96-7p* requires the ALJ to articulate the reasons for his credibility findings. In particular, *SSR 96-7p* provides:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p; see also Fargnoli, 247 F.3d at 41 (citations omitted) (in determining claimant's RFC, ALJ must review all relevant medical and non-medical evidence and explain his conciliations and rejections); Burnett, 220 F.3d at 121-22 (citations omitted) (same).

In his Findings, the ALJ states that he found "[Plaintiff]'s allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." (Finding No. 5, R. 23.) However, the body of the decision does not specifically state the reasons for the ALJ's credibility assessment, thus leaving the Court to extrapolate as to the exact reasons for the ALJ's credibility determination. In reviewing the body of the decision, the Court notes that the ALJ, in assessing Plaintiff's RFC, states he considered the objective clinical findings and Plaintiff's subjective assertions with respect to pain and other symptoms. (R. 21.) In the sentence and paragraph immediately following this statement, the ALJ appears to set forth the factors he considered in determining Plaintiff's RFC. These factors include: (1) his observation of Plaintiff at the hearing and conclusion that Plaintiff showed no signs of physical or mental distress; (2) his finding of no indication that Plaintiff's medications resulted in significant adverse side effects which would further impair Plaintiff's concentration or otherwise interfere with his ability to perform at least sedentary work; (3) Plaintiff's symptoms involve his left arm and upper extremity but he is

47

right-hand dominant; (4) since his surgery, Plaintiff has continued to require only conservative medical treatment for his physical complaints and anxiety; (5) Plaintiff is able to do a full range of daily activities; and (6) Dr. Mustovic indicated that Plaintiff was able to do some activities with assistance and drive.  (R. 21.)

Assuming the above factors constitute the ALJ's reasons for assessing less than full credibility to Plaintiff's complaints, they fall short of the mark required by the regulations and *SSR 96-7p,* because the factors delineated by the ALJ are not supported by the record evidence.  In addition, nowhere in the decision does the ALJ make clear the weight, if any, given to Plaintiff's complaints and the reasons for that weight.  *SSR 96-7p.*

Under step one of the two-step evaluation process, it is clear that the record contains objective medical evidence of physical and mental impairments that could reasonably be expected to produce Plaintiff's pain, left upper extremity and left arm weakness, and fatigue.  This evidence consists of the following diagnosed physical and mental impairments: Degenerative disc disease of cervical spine, cervical post-laminectomy syndrome and ongoing neck pain associated therewith, slowing of the median nerve in his right wrist (mild carpal tunnel), asthma, insomnia, low back pain, left leg symptoms, and generalized anxiety disorder.  The medical reports and records of Plaintiff's treating physicians show that Plaintiff's physical mental conditions could reasonably be expected to produce pain, fatigue, and left-sided weakness, and mild to moderate difficulties with concentration and keeping pace for extended periods of time.  In addition, the reports of the state consulting physician and psychologist support the findings of Plaintiff's treating physicians.  Therefore, the record contains uncontradicted objective medical evidence to support Plaintiff's complaints of pain, left-sided weakness, and fatigue.  Accordingly, the Court turns to the ALJ's

evaluation of the intensity, persistence, and limiting effects of these symptoms on Plaintiff's ability to do basic work activities.

The first factor the ALJ apparently considered in his evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms on his ability to do basic work activities was the ALJ's observation of Plaintiff at the hearing: After 45 minutes of sitting, the ALJ observed that Plaintiff changed to a standing position, and concluded that Plaintiff otherwise did not show any signs of significant physical or mental distress.  Here, all of the records of the treating and consulting physicians support Plaintiff's statement that he cannot sit for prolonged periods of time and that he must alternate standing.  The ALJ's observation at the hearing that Plaintiff stood after about 45 minutes is consistent with the medical evidence and Plaintiff's allegation of limitation.  Moreover, as the Court  concluded in Part b above, to the extent the ALJ relied on his observation of Plaintiff at the hearing  to discredit Plaintiff's alleged limitations from his symptoms, this Court has already concluded that the ALJ's reliance on his observation was misplaced, and therefore, cannot be used to discredit Plaintiff's complaints.

The next factor that the ALJ considered was his finding that there was no indication that Plaintiff's medications resulted in significant adverse side effects which would further impair Plaintiff's concentration or otherwise interfere with his ability to perform at least sedentary work.  As stated above, however, the Court found the ALJ did not consider the clinical findings supporting Plaintiff's insomnia and the unsuccessful medical treatment he received for his insomnia, in combination with the side effects (drowsiness and sleepiness) of Plaintiff's medications, and

therefore, the ALJ's finding is not supported by the record.  Accordingly, the ALJ's reliance on this factor is also misplaced.

Another factor that the ALJ considered in assessing Plaintiff's RFC was his finding that Plaintiff has some signs of clinical atrophy involving his left upper extremity and has symptoms involving his left arm, but he is right-hand dominant.  It is not clear exactly how this finding has any bearing on Plaintiff's credibility and the ALJ's decision provides no illumination.  Moreover, the medical evidence shows that Plaintiff has mild carpal tunnel syndrome in his right hand/wrist, yet the ALJ does not mention this condition in his discussion of Plaintiff's RFC.

Another factor that the ALJ considered was his finding that since his surgery, Plaintiff continues to require only conservative medical treatment for his physical complaints.  However, the Court finds that this factor should not be weighed against Plaintiff because he sought conservative medical treatment after his surgery based on the recommendations of his treating physicians, Doctors Reidy, Bonaroti, and Busis (R. 273, 286, 344-45, 347), and Doctors Mustovic and Reidy found that Plaintiff has likely reached maximum medical improvement. (R.299, 345.)   Therefore, this factor should not have weighed against Plaintiff in evaluating his credibility.

The final factor the ALJ considered in determining Plaintiff's RFC was his finding that Plaintiff could perform a full range of daily activities, and that Dr. Mustovic indicated that Plaintiff was able to do some activities with assistance and drive.  However, Plaintiff argues in his brief that the ALJ's statement, that he was "able do a full range of daily activities, use a computer, walk his dog, care for all of his personal needs, shop, do the dishes, clean house, drive, cook, and handle

finances" (R. 21), does not take into account Plaintiff's statements in his DAQ or hearing testimony as to limitations on these ADLs, which limitations are stated consistently throughout the record. (Pl.'s Br. at 21-22.) In addition, Plaintiff posits that just because he can perform some ADLs with limitations does not provide a basis for finding that he is not fully credible or is not disabled.  In support of this argument, Plaintiff cites *Schwartz v. Halter,* 134 F.Supp.2d at  654 n. 13 (citing 20 C.F.R. § 404.1572c) (activities such as shopping with his wife, visiting his mother twice a week, and driving his car every day were fully consistent with the limited abilities alleged by both the claimant and his treating physician); *Rieder v. Apfel,* 115 F.Supp.2d 496, 504-05 (M.D.Pa. 2000); *Smith,* 637 F.2d at 971-72; *Wright,* 900 F.2d at 682; and *Fargnoli,* 247 F.3d at 40; among others.

The Court agrees with Plaintiff.  A review of the record shows that the ALJ mischaracterized Plaintiff's statements regarding his non-work activities in several respects.  First, the ALJ ignores Plaintiff's testimony that although he is able to do some of the daily activities, he is limited as to what he can do and the duration of the particular activity.  Dr. Reidy has opined that Plaintiff's complaints are consistent with his cervical post-laminectomy syndrome, clinical findings, and the MRI/electrodiagnostic tests.  (R. 367-68.)  In addition, Dr. Mustovic noted that Plaintiff attempts to do some outside work but with the assistance of his children, is able to drive a car, and although he can wash dishes and to the laundry, he experiences increased symptoms with these activities.  (R. 298.)  Dr. Uran, the consultative psychologist, noted that Plaintiff was restricted  in his ability to perform ADLs of cleaning, shopping, and maintaining his residence, and concentration and task persistence.  (R. 296.)  Moreover, although the RFC assessments of Plaintiff's functional capacity completed by the DDS physician and psychologist were not as restrictive, these RFC assessments

were rejected by the ALJ in view of the record and pursuant to *SSR 96-6p*.[41]  (R. 22.)

In addition, the case law clearly holds that just because Plaintiff is able to engage in some non-work activities, that does not provide a basis for finding he has no credibility and has the ability to work.  *Reider,* 115 F.Supp.2d at 504. "[T]he law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability." *Reider,* 115 F.Supp.2d at 504-05 (citing *Smith, supra*; *Wright, supra*). Mere involvement in a few social activities is not sufficient to support a finding that a claimant's complaints are not fully credible.  *Smith,* 637 F.2d at 971-72.

The ALJ here seems to have relied extensively on Plaintiff's testimony that he was able to do some household chores, use a computer, and drive a car.  However, as the district court found in *Reider,* "statutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly, shopping for the necessities of life is not a negation of disability." *Reider,* 115 F.Supp.2d at 505.  "[S]poradic or transitory activity does not disprove disability" and having a disability does not require that claimant "vegetate in a dark room excluded from all forms of human and social activity." *Id.* (citing *Yawitz v. Weinberger,* 498 F.2d 956 (8th Cir. 1974); *Smith,* 637 F.2d at 971-72); *see also Thompson v. Barnhart*, 281 F.Supp.2d 770, 781 n. 7 (E.D.Pa. 2003) (citing *Smith*, *supra*).

Based on this authority, the Court concludes that Plaintiff's activities, consisting of using a computer, doing laundry, cooking and cleaning with assistance, writing checks, taking a short walk with his dog, driving a car short distances with difficulty, attending  church and his children's extra-curricular events, do not provide a basis for discrediting Plaintiff's complaints. Like the claimant's

---

[41]        In addition, RFC assessments alone do not constitute substantial evidence.  *Reed v. Barnhart,* 419 F.Supp.2d 625, 632 (D.Del. 2006) (citing *Green,* 749 F.2d at 1071 n.3).

activities in *Reider*, Plaintiff's activities here are minuscule and more demonstrative of his inability to engage in substantial gainful activity.  Moreover, his activities are entirely consistent with his complaints of pain, diagnosed medical impairments, the clinical findings, MRI scans, and electrodiagnostic tests, as delineated in Dr. Reidy's reports.

In addition, the Court finds that *Hartranft*, cited by Defendant in support of the ALJ's credibility finding, is distinguishable on its facts and therefore inapposite here.  Unlike the claimant in *Hartranft,* the record here shows that Plaintiff's complaints of pain and other symptoms are not inconsistent with the objective medical evidence or his own description of his daily activities. Indeed, Plaintiff's treating physician, Dr. Reidy, specifically found that Plaintiff's activities and complaints are consistent with his diagnosed medical impairments, MRI scans, clinical findings of left-sided weakness, and electrodiagnostic test results.  Therefore, the Court finds the ALJ's reliance on Plaintiff's limited activities to discredit his complaints of pain, fatigue, and left-sided weakness, was improper.

Notably absent from the ALJ's discussion of the factors he considered in evaluating Plaintiff's complaints regarding his limitations is Plaintiff's prior work history.[42]  As the Plaintiff points out in his brief, the record shows he has a significant work background as a cardiac rehabilitation specialist and exercise physiologist, with thirty years of earnings records, and the OVR counselor described Plaintiff as "professional in his nature, hard working, sincere, and goal oriented. (R. 68)."  (Pl.'s Br. at 19.)  Plaintiff contends his good faith and resolve to work is further evidenced

---

[42]        Also notably absent from the ALJ's credibility assessment is any discussion of the results of the surveillance activity investigation, and Dr. Reidy's opinion that the reported activities were consistent with Plaintiff's claimed limitations, and supported by his cervical post-laminectomy syndrome, clinical findings and tests.  (R. 367-68.) On remand, the ALJ should address this evidence.

by (1) his use of OVR for assessment and job referrals after he had to leave his regular job; (2) an unsuccessful work attempt in 2003; (3) undergoing surgery and physical therapy; (4) his regular visits to treating physicians; (5) submitting to regular x-rays and MRIs; (6) taking his medications; and (7) his physicians and counselors attestations as to his credibility and reliability.  (R. 20.)  (Pl.'s Br. at 20.)  Given his long work history, Plaintiff submits his subjective complaints are entitled to substantial credibility, citing as authority, *Weber v. Massanari,* 156 F.Supp.2d 475, 486 (E.D.Pa. 2001) (citing *Taybron v. Harris,* 667 F.2d 412, 415 n.6 (3d Cir. 1981)); *Rieder,* 115 F.Supp.2d at 505  (citing *Dobrowlolsky v. Califano,* 606 F.2d 403, 409 (3d Cir. 1979)).

The Court agrees with Plaintiff and finds that given his extensive work history, his testimony should have been given great weight.  *Weber,* 156 F.Supp. 2d at 486 (citing *Taybron v. Harris,* 667 F.2d at 415).  In *Weber,* the evidence showed that the claimant worked for the same employer for fifteen years, and therefore his testimony about his work capabilities was entitled to great weight. *Id.*  Similarly in *Reider,* the district court found that based on the claimant's long work history, the ALJ was required to give the claimant's testimony about her work capabilities great weight.  115 F.Supp.2d at 505 (citing *Dobrowolsky,* 606 F.2d at 409).  Here, Plaintiff's work history in the same or related occupation spans approximately 30 years.   Therefore, the ALJ should have given Plaintiff's testimony about his work capabilities great weight.  Unfortunately, the ALJ fails to discuss Plaintiff's prior work history and therefore, it is impossible to determine what, if any, weight, the ALJ accorded  to Plaintiff's testimony based on his work history.

The district court in  *Rieder* further held that the ALJ's credibility determination was flawed because it failed to properly consider the claimant's unsuccessful work attempts.  *Id.*  In that case,

54

the record showed that the claimant had always worked or been looking for work, and after her accident, attempted to work several times but was unsuccessful.  The district court in *Reider* found that the problems the claimant had during her unsuccessful work attempts coincided with her medical problems, *i.e.,* significant memory deficits,  and therefore helped to substantiate the medical findings of record.  *Id.*  Accordingly, the district court in *Reider* hled that the ALJ erred in failing to address this evidence.  *Id.*  Like the claimant in *Rieder,* the Plaintiff here encountered increased neck pain and left arm discomfort during his unsuccessful attempt at light duty work in September 2003, which coincides with his documented cervical post-laminectomy syndrome, MRI findings, electrodiagnostic testing, and clinical findings of weakness and atrophy of his left upper extremity.  (R. 366-67.  Therefore, the Court concludes the ALJ erred in failing to address this relevant evidence in assessing Plaintiff's credibility.

In summary, the ALJ failed to delineate the specific reasons for his credibility assessment and the weight assigned to Plaintiff's complaints.  Nonetheless, the Court has attempted to review the possible bases for the ALJ's credibility and RFC assessment, and has concluded that the ALJ's findings in this regard are flawed because the factors upon which the ALJ relied in evaluating Plaintiff's complaints are not supported by the record.  In addition, the ALJ failed to consider other relevant evidence which substantiates Plaintiff's complaints.  Accordingly, the Court finds the ALJ's finding as to Plaintiff's credibility is not supported by substantial evidence.  On remand, the ALJ should consider the evidence of record and reevaluate Plaintiff's credibility in compliance with this Report and Recommendation.

### 4.      Hypothetical Questions Presented to VE Were Legally Flawed

Finally, Plaintiff presents two legal arguments in challenging the ALJ's decision at Step Five:

First, Plaintiff submits that in formulating the first hypothetical question, the ALJ failed to include

all of Plaintiff's medically documented impairments or provide an explanation for their exclusion

from the hypothetical; and second, Plaintiff submits the revised hypothetical was also flawed in that

the ALJ's clarification, that Plaintiff was capable of returning to "all sedentary work", in essence

eliminated the specific limitations included in the first hypothetical question, and eliminated by

implication exertional and non-exertional limitations, thereby preordaining the VE's response to the

revised hypothetical question.   (Pl.'s Br. at 11-12.)   Accordingly, Plaintiff contends that neither

hypothetical question is supported by substantial evidence and requests reversal of the ALJ's

decision.   Each of these arguments is addressed below.

In order for the Court to find that a hypothetical question was based on substantial evidence,

the "hypothetical question must reflect all of a claimant's impairments *that are supported by the*

*record.*" *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987) (citing *Podedworny v. Harris,*

745 F.2d 210 (3d Cir. 1984); *Wallace v. Sec'y,* 722 F.2d 1150 (3d Cir. 1983)) (emphasis added).

In determining whether an impairment is supported by the record, the Court is guided by 42 U.S.C.

§ 423(d)(5)(A) (2003) which provides in relevant part:

> An individual's statement as to pain or other symptoms shall not
> alone be conclusive evidence of disability . . . there must be medical
> signs and findings, established by medically acceptable clinical or
> laboratory diagnostic techniques, which show the existence of a
> medical impairment that results from anatomical, physiological, or
> psychological abnormalities which could reasonably be expected to
> produce the pain or other symptoms alleged and which, when
> considered with all evidence required to be furnished under this
> paragraph (including statements of the individual or his physician as

56

to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques . . . must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423(d)(5)(A) (2003). *See also,* 20 C.F.R. §§ 404.1529(b), 416.929(b) (2003).

Turning to his first argument, Plaintiff specifically claims that the ALJ improperly excluded from the first hypothetical question the following medical conditions:  Plaintiff's allergies, sleep disorder, and the side effects of medications that cause drowsiness and sleeplessness, as well as asthma induced by environmental odors, and failed to provide an explanation for their exclusion. (Pl.'s Br. at 11.)  Because the ALJ failed to include these conditions in the first hypothetical, Plaintiff contends the ALJ also failed to include any limitations on Plaintiff's RFC.  The Court agrees in part with Plaintiff and finds the first hypothetical question posed by the ALJ was flawed, as it does not include all of the medical impairments supported by the objective medical evidence.   The objective medical evidence shows that Plaintiff suffered from, and was treated for, insomnia, a sleep disorder, during the alleged disability period.  Nonetheless, the ALJ failed to note this medical impairment in both  assessing Plaintiff's RFC and posing the hypothetical question.   In addition, the ALJ failed to include the side effects of drowsiness and sleepiness from Plaintiff's medications, which are supported by the objective medical evidence.   All that is required for inclusion in the hypothetical question is that the impairment be supported by objective medical evidence.   There is no requirement that the effect or limitation of the impairment be significant.   Accordingly, the Court finds that the ALJ should have included Plaintiff's insomnia and side effects (drowsiness and sleepiness) from his

medications in the hypothetical question. Having failed to do so, the ALJ's finding at step five is not supported by substantial evidence.

However, the Court finds no merit to Plaintiff's argument that the ALJ should have included in the first hypothetical question Plaintiff's allergies and that Plaintiff's asthma is environmentally induced. Documentation exists in the record to show that Plaintiff was treated for allergies in the past, however, there is no evidence that Plaintiff was treated for allergies during the alleged period of disability, or that such allergies had any limiting effect on Plaintiff's RFC. (R. 298.) With regard to Plaintiff's asthma, the ALJ did include this condition in the first hypothetical question, however, he did not specifically state that it was environmentally induced. The Court finds that the ALJ did not err in failing to state that Plaintiff's asthma was environmentally induced, as the record shows that Dr. Mustovic took into consideration Plaintiff's asthma when she completed a functional capacity assessment and did not assess any environmental limitations, and there is no medical evidence to the contrary.

Plaintiff's second argument regarding the revised hypothetical question likewise raises a valid concern. In the subsequent, revised hypothetical question, the ALJ asked the VE if Plaintiff would be able to either return to his past jobs or any other jobs in the national economy at the sedentary level, if Plaintiff otherwise was able to work a full day without the need to lie down. Before responding, the VE asked for clarification regarding what he was supposed to assume was credible, to which the ALJ replied that Plaintiff "is able to return to all the sedentary work." (R. 406.) The VE then replied that jobs did exist in the national economy that Plaintiff would be able to perform at the sedentary level that required little, if any, use of the non-dominant arm. Based on the VE's opinion, the ALJ found that "[a]lthough the claimant's limitations do not allow him to perform the

58

full range of sedentary work, there are a significant number of jobs in the national economy that he could perform."  (R. 22 & Finding No. 13, R. 23.)  Therefore, the ALJ ultimately concluded that Plaintiff was not disabled.

Plaintiff contends that the revised hypothetical, including the subsequent colloquy between the VE and ALJ, is flawed in that the ALJ's clarification, that Plaintiff was capable of returning to "all sedentary work", in essence eliminated the specific limitations included in the first hypothetical question, and eliminated by implication exertional and non-exertional limitations, thereby preordaining the VE's response to the revised hypothetical question. (Pl.'s Br. at 11-12.) In response, the Commissioner acknowledges that the "ALJ's hypothetical question was not easy to follow" but nonetheless submits that the VE's testimony shows that he fully understood Plaintiff's mental and physical limitations and that the jobs identified by the VE are appropriate for someone with mild mental limitations and a non-dominant arm that is not fully functional.  (Def.'s Br. at 11.) Defendant's argument completely misses the mark.  As explained below, it is unclear what limitations the ALJ intended to include in the revised hypothetical question and therefore Defendant's focus on the VE's "understanding" of these limitations is misplaced.

Rather than clarify the issue, the Court finds the ALJ's response to the VE's question actually added to the confusion.  By telling the VE to assume Plaintiff could "return to all the sedentary work", *i.e.,* the full range of sedentary jobs, he appears to have negated the previously enumerated impairments and resulting limitations, and exertional and non-exertional limitations assumed in the first hypothetical question.  In any event, it is unclear what, if any, limitations the ALJ wanted the VE to assume in the revised hypothetical.  To add to that confusion, the VE, in opining that jobs did exist in the national economy which Plaintiff could perform, qualified his opinion by adding that the

59

jobs to which he testified were all entry level jobs that required little, if any, use of the non-dominant

arm.  But in light of the ALJ's reply, the VE did not have any basis for assuming any limitations to

sedentary work.  Therefore, because it is unclear as to the exact limitations intended by the ALJ in

the revised hypothetical question and assumed by the VE in responding thereto, the Court cannot

determine whether the revised hypothetical question is supported by substantial evidence.[43]

Accordingly, the Court finds the Commissioner has not met its burden of proof at Step Five.

> **5.    ALJ Erred in Concluding Work Existed in
> National Economy That Plaintiff Could Perform
> Based on VE's Response to a Flawed Hypothetical
> Question**

Plaintiff submits that the VE's conclusion that a significant number of jobs existed in the

national economy that Plaintiff could perform was predicated on the revised hypothetical question

which assumed that Plaintiff could perform all sedentary work.  However, because the revised

hypothetical was not supported by substantial evidence, the VE's testimony is unreliable and

therefore, Plaintiff contends the ALJ erred in relying on such testimony in finding that Plaintiff was

not disabled at Step Five.  Plaintiff's point is well-taken.  Because the Court has determined that the

Commissioner has not met her burden at Step Five in formulating the hypothetical questions, then

any opinions by the VE based on the flawed hypotheticals are likewise flawed.

> **F.    Claimant's Request for Reversal without Remand**

Plaintiff requests an outright reversal without remanding his claim back to the ALJ for further

consideration.  In this circuit, the Court of Appeals has held that "remand for an award of benefits

is inappropriate unless 'under the correct standard the result is foreordained.'"  *Holler v. Barnhart,*

---

[43]      Because the ALJ does not identify which limitations, if any, were to be assumed by the VE in the revised
hypothetical question, the Court is precluded from determining whether the limitations, or lack thereof, are supported
by the record.

No. 03-4249, 102 Fed.Appx. 742, 745, 2004 WL 1208879, *2 (3d Cir. June 2, 2004) (citing *Kowalchick v. Director, OWCP,* 893 F.2d 615, 624 (3d Cir. 1990)).   Here the result is not foreordained because it is unclear whether all of Plaintiff's complaints are fully credible, and the effect on his RFC, and whether any jobs exist in the national economy which the Plaintiff can perform given appropriate testimony by a VE based on a hypothetical which includes all limitations on sedentary work that are supported by the record.   In addition, this case is not similar to *Podedworny v. Harris,* 745 F.2d at 223, where the Court of Appeals reversed without remanding the case to the ALJ because the court had previously remanded the case to the ALJ on two prior occasions and determined that "it would be virtually impossible . . . in a third hearing to adduce the new vocational and medical evidence that would be necessary to supporting a finding that th[e] [claimant] is not disabled[.]" Here there has not been any previous remands and it is entirely possible that new vocational testimony, based on a hypothetical question that properly includes all of Plaintiff's medical and psychological impairments supported by the objective medical evidence, could support a finding that Plaintiff is not disabled.   Therefore, for the reasons set forth above, the Court recommends that this case be remanded to the Commissioner for rehearing and for such other proceedings to assess Plaintiff's credibility and RFC vis a vis his alleged limitations in light of all the evidence, and to determine whether Plaintiff is capable of performing sedentary work in light of all his medical and psychological impairments and resulting limitations, including pain and other nonexertional limitations, that are supported by the medical and other evidence.

III.   **CONCLUSION**

For the reasons set forth above, it is recommended that Plaintiff's Motion for Summary

Judgment be granted. It is further recommended that Defendant's Motion for Summary Judgment be denied, and that the decision of the Commissioner of Social Security denying Plaintiff's request for an award of disability insurance benefits and supplement security income be reversed and the case be remanded for rehearing, pursuant to sentence four of 42 U.S.C. § 405(g),[44] and for such other proceedings as are consistent with this Report and Recommendation

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: February 5, 2007                                     BY THE COURT:


                                                            __s/Lisa Pupo Lenihan_____
                                                            LISA PUPO LENIHAN
                                                            United States Magistrate Judge

cc:      Honorable Gary L. Lancaster
         United States District Judge

         All Counsel of Record
         *Via Electronic Mail*

---

[44]        Sentence four of 42 U.S.C. § 405(g), provides in pertinent part that "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."   Because Section 405(g) clearly provides that a court may allow for a rehearing following remand,  *see Sullivan v. Finkelstein*, 496 U.S. 617, 625 (1990), a rehearing should be held in this case for the purpose of determining whether a significant number of jobs exist in the national economy which the Plaintiff could perform in light of all of his exertional and nonexertional limitations, including pain.